## ADAMS EXPRESS COMPANY *v.* OHIO STATE AUDITOR.

PETITION FOR REHEARING OF NO. 337 REPORTED 165 U. S. 194; AND NOS. 469, 470 AND 471, REPORTED 165 U. S. 255.

Received March 1, 1897. — Decided March 15, 1897.

The members of the court who concurred in the above named judgments, add a few observations to what has been already said.

It is well settled that no State can interfere with interstate commerce through the imposition of a tax which is, in effect, a tax for the privilege of transacting such commerce; and also that such restriction upon the power of a State does not in the least degree abridge its right to tax at their full value all the instrumentalities used for such commerce.

The state statutes imposing taxes upon express companies which form the subject of these suits grant no privilege of doing an express business, and contemplate only the assessment and levy of taxes upon the properties of the respective companies situated within the respective States.

In the complex civilization of to-day a large portion of the wealth of a community consists of intangible property, and there is nothing in the nature of things or in the limitations of the Federal Constitution which restrains a State from taxing such intangible property at its real value.

Whenever separate articles of tangible property are joined together, not simply by a unity of ownership, but in a unity of use, there is not unfrequently developed a property, intangible though it may be, which in value exceeds the aggregate of the value of the separate pieces of tangible property.

Whatever property is worth for the purposes of income and sale, it is worth
    for the purposes of taxation; and if the State comprehends all property
    in its scheme of taxation, then the good will of an organized and estab-
    lished industry must be recognized as a thing of value, and taxable.

The capital stock of a corporation and the shares in a joint stock company
    represent not only its tangible property, but also its intangible property,
    including therein all corporate franchises and all contracts, privileges
    and good will of the concern; and when, as in the case of the express
    company, the tangible property of the corporation is scattered through
    different States by means of which its business is transacted in each, the
    situs of this intangible property is not simply where its home office is, but
    is distributed wherever its tangible property is located and its work is
    done.

No fine spun theories about situs should interfere to enable these large cor-
    porations, whose business is of necessity carried on through many States,
    from bearing in each State such burden of taxation as a fair distribution
    of the actual value of their property among those States requires.

THIS was an application for leave to file a petition for a re-
hearing of the several cases decided February 1, 1897, under the
title of *Adams Express Company* v. *Ohio State Auditor*, and re-
ported 165 U. S. 194; and of *American Express Company* v.
*Indiana*, *Adams Express Company* v. *Indiana*, and *United
States Express Company* v. *Indiana*, decided February 1, 1897,
and reported 165 U. S. 255. The petition was as follows:

To THE SUPREME COURT OF THE UNITED STATES:

Your petitioners, the appellants in the above entitled causes,
respectfully pray for an order directing a reargument of the
said causes upon the following grounds:

*First.* — The total insufficiency of the argument offered by
the counsel for the appellants, due to a failure on their part
to anticipate the grounds which have really led to the decision
of the court.

*Second.* — The extreme importance and far reaching effect
of the decision which has been announced, as bearing upon
some of the most fundamental principles of constitutional
law.

*Third.* — Its momentous practical importance as affecting
existing interests, making it wholly impossible for the appel-
lants to continue the express business of the country under
the system of taxation sanctioned by the decision, in view of

Petition for Rehearing.

the natural tendencies of the different States to compel contributions from that business; tendencies against which the law affords the most meagre, if any, protection.

*Fourth.* — The entire novelty of the questions discussed and of the points necessarily determined by the judgment.

*Fifth.* — The fact that under the circumstances such failure on the part of counsel is not without reasonable excuse.

*Sixth.* — That the appellants believe and are so advised by their counsel, that a further consideration of the cases and a consideration of reasons which have not heretofore, in consequence of the failure aforesaid, been stated, will lead this honorable court to a decision in favor of the appellants.

*Seventh.* — We beg finally to suggest that upon the question whether the Nichols law denies the appellants the equal protection of the laws, this court has erroneously assumed that the taxing laws of Ohio classify property of different sorts for purposes of valuation.

And your petitioners respectfully ask for an attentive consideration of the paper annexed hereto, in which an attempt is made to more fully state and to support the grounds above mentioned, with such brevity, however, as the nature of this petition and the rule of the court requires, and they further pray that the above entitled cases be set down for reargument before the court upon some day by it to be appointed.

And as in duty bound will ever pray.

JAMES C. CARTER,
LAWRENCE MAXWELL, JR.,
Counsel for Appellants.

We certify that, in our opinion, the foregoing petition for rehearing is well founded.

JAMES C. CARTER,
LAWRENCE MAXWELL, JR.,
Counsel for Appellants.

GROUNDS UPON WHICH THE REARGUMENT IS ASKED.

*First.* The total insufficiency of the argument heretofore offered by counsel for the appellants due to a failure on their

part to anticipate, in any adequate degree, the grounds which have really led to the decision of the court.

It is important in the first place that the precise substance and effect of the decision should be stated.

A review of the decisions of this court prior to the argument of the present cases and referred to in the opinion of the court just pronounced as being, in point of authority, the foundation of the decision is appended hereto in an appendix.

From this review it is believed that the following is a fair and just statement of the propositions actually determined by those decisions.

1. They rightly assume two principles as incontrovertible; first, that, so far as concerns the taxation of *property*, a State cannot tax, as against non-residents, any property except such as has an *actual situs* within its limits; second, that no State can tax or burden in any form the business of interstate commerce.

2. That where a State *assumes* only to tax property *actually situated within its limits*, it does not violate either of the above principles if, in ascertaining the value, it adopts *the ordinary method* of assessment; or, where the ordinary method is not practicable, some other fair and reasonable method.

3. That in the case of railroad and telegraph companies, the ordinary method is not applicable, and the method of taking into view the value of the *whole*, in order to ascertain the value of the part, is fair and reasonable, at least so far as to justify an apportionment of value according to *mileage*.

The step now taken by the present decision is to evolve a new general proposition, not declared or distinctly discussed in any of the prior cases, that where there is what is called a *unity of use* between several pieces of property not united together by any physical tie, some of the pieces situated within and some without the State, the value of the parts within may be determined by the value of the whole, even though the part within is *physically separable, and is, as separated, an ordinary thing, having an ordinary market value based upon its capability of similar uses in a multitude of different businesses*, differing in nothing, so far as the

ascertainment of value is concerned, from the thousand other classes of chattels which form the usual subjects of taxation.

No precise explanation is given of just what this *unity of use*, which involves such momentous consequences, may be; but it is held that the property of express companies is of that character.

This doctrine of the effect upon taxation of a *unity of use* was not discussed in the prior cases, and was not touched by appellants' counsel in the argument of these cases. The excuse for this omission will hereafter be given. But the argument which they thought abundantly sufficient to defeat the assessments consisted in pointing out that the property taxed was, both physically, and in respect of ownership, *capable of separation without altering its identity, or any of its properties, or its value, as ordinarily understood*, and would remain, after separation, an ordinary subject of taxation, and that to tax it as it was taxed under the Ohio law, was *in effect* to tax property outside of the State, and also the business of interstate commerce. This argument, which seems not to be disputed, must be regarded as rendering the validity of the taxation, at least, doubtful. The weighty dissent fairly entitles it to be so considered.

The additional arguments and illustrations which they might have adduced, but did not, are as follows:

1. The *unity* which makes the property so taxable is said in the opinion of the court to be dependent, not upon *physical connection*, or unity of ownership, but to be sufficiently constituted by unity of *use*.

But suppose the Adams Express Company should, in Ohio, *hire* all its horses, wagons, etc., as it easily might without materially affecting its business, and for the ordinary rates. The same *unity of use* would continue. Would the *owner* (the horses, wagons, etc., being worth $42,065) be properly assessed for taxation at $533,095.80, although he had no interest in the express business? If not, is there really any *unity of use* which justifies these assessments?

2. Again let it be supposed that the company *reduces* the amount of its horses, wagons, etc., to one half, not by hiring

from others, but by *substituting human carriers*, which it easily might do without substantially affecting its receipts. This would not alter the proportions of mileage, or gross receipts, and therefore, although the amount of the property *purporting to be valued* were reduced one half, the *valuation would be the same*. And, supposing it hired all its horses, wagons, etc., *except one horse and wagon*, owning no other personal property than that, the valuation would still be unaffected.

3. If, however, it should hire *all* and own no personal property whatever, it would then be wholly relieved, for the assessors would be left without a subject for assessment: That is to say we have a scheme of assessing the value of the personal property owned by express companies in Ohio wholly unaffected by the amount which is owned.

4. Perhaps it may be suggested that the assessment would, in the case of hiring by the express companies, stand as an assessment not of the *property* but of its *use*. But under this law, certainly, nothing can be assessed except the value of the *property*, and that against its *owner*. Let it be supposed, however, that this were otherwise, or that the law were changed so as to tax the *use*. Would the *owners* of the horses and wagons still be justly taxable on them, and on what amount? Or, would this property be exempt from further taxation? There would seem to be no just reason for not taxing it against the real owner, and on the full value; and in that case we would have a horse assessed at its true value, $150 to the *owner*, and at about $4000 to the *user*.

5. And yet, in the case last mentioned, consistent reasoning requires that the owner should be exempt, for if the plant really be united it is *inseparable*, and if it remains *in* the unity for purposes of taxation, it cannot at the same time be out of it for the same purpose.

It may, indeed, be suggested that the case would be one, after all, only of double taxation, and that this, however flagitious, is not a subject of criticism in a Federal court. But we beg to refer to the opinion of Mr. Justice Brewer, in *Cleveland, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 439, repeatedly approved, and so recently as in the case of *Western*

*Union Tel. Co.* v. *Taggart*, 163 U. S. 1, that it is only *fair, reasonable, ordinary, necessary* taxation which is, in such cases, a defence against the charge of violating both the fundamental principles above referred to, which principles are committed to the care of the Supreme Court.

6. But what shall be said of the pretence by Ohio that the different parts of the plant are an *inseparable unity* when she herself asserts that they are *not*, and, *in this same law*, actually separates them for the purpose of taxation? If all the property of the company composes, as is said, this united inseparable plant, then, certainly, the real estate in Ohio is part of it and an inseparable part; but that State finds no difficulty in separating it, and imposes on the company an entirely separate assessment of $58,000 and upwards, on this account.

The real estate of the companies in Ohio is there assessed like that of other owners. The law requires *this assessed value* to be included in the return made by the companies to the board of assessors, and *adopts* it and taxes it accordingly and separately. It thus assumes and declares that the value of *this* property, although as much a part of the unity as any other, does *not* depend for its value, as it plainly does not, upon the use to which it is put, but upon the same elements which determine the value of all other lands and buildings in the State.

7. The principal idea which underlies the opinion of the court and is made to defend these extraordinary assessments is that the value of property is dependent upon the *use* to which it is put. We earnestly request the court to reconsider this proposition. It is an expression which has several times been employed to support the doctrine declared in the railroad and telegraph cases, and in the sense there intended is entirely just. In cases where the ordinary and nearly universal methods of ascertaining value cannot be employed, where the thing to be valued has no market value, where it cannot be *indefinitely produced*, where there is no *supply and demand*, there is a necessity of resorting to other considerations, and the *productiveness* of the property, in other words, the value of the *use* of it, is a *natural, ordinary* and *proper*

inquiry; for if the thing were to be sold just as it is, that would be the inquiry of the intending purchaser. But this method is the creature of necessity, and should be carefully limited to that necessity. Can it be thought for a moment that this proposition should be made general and the value of property generally be held to be determined by the *use* to which it is put, and not at all by the fact that it is a common subject of sale in the market, and has a distinct and certain market value? What would be said of a system of taxation of ordinary property wholly within a State, which should direct or permit an assessing board to displace the ordinary tests of value, namely, what the things are bought and sold for, and inquire, in each instance, into the profits which the owners made who use them, and then impute those profits to the particular thing, making houses and lands, horses and cattle, and all other chattels bear every variety of value? Such a system would be in violation of fundamental notions of right, and would make fairness and equality in taxation impossible. It would not be taxation, but arbitrary exaction. And yet this would be justified if the proposition under notice were sound.

If this is not sound as a *general* proposition, is it sound in any cases, and why is it sound in them? It is sound in cases *where there is no better method*, and sound because necessary.

We have referred to the opinion of the court in *Cleveland, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 439, drawn up by Mr. Justice Brewer, as laying down the true reason (necessity) for the assessment of part of a railroad lying within a State, by a reference to the value of the whole. In that opinion there are, indeed, expressions to the effect that the value of all property is determined by its use, as if this were true as a broad and general proposition (p. 445); but did Mr. Justice Brewer really mean this? Did he mean that this was the ordinary test? Did he mean that where the common judgment of men, based upon all the elements of value, the *uses* to which the property may be put, *supply and demand*, etc., had established a value (for this is what is *ordinarily* meant by value) that judgment could be *disregarded*, and an assessing

board be permitted to establish another value based on *use* alone, or did he mean that in those cases where common judgment had never had occasion to fix a. value, and never had done it, and where, consequently, a value so fixed was not available, an assessing board was *obliged* to have recourse to the original elements of value and make up, as best it could, a judgment? We have only to recur to the other parts of the opinion to see that the latter meaning was all that he intended.

8. What then is the precise error, as we humbly conceive it to be, in the decision? It finds that in the railroad and telegraph cases there was declared to be property actually situated within the State and therefore taxable there. The problem, as declared by the court, was to ascertain its *cash* value. There was no market value. The subject of taxation was not one capable of indefinite production, and not subject to the operation of supply and demand. To separate it from the use to which it was put would be to destroy it, and it would have no value, except as a ruin, for its materials. But yet it *had* a cash value which a purchaser would give for it, and this *in the purchaser's mind* would depend on the *use* to which it was put. Now in *those cases* the use to which the thing was put was in inseparable unison with other things, together constituting a whole, as much as a dwelling house which happened to rest on both sides of a state line, and the value of the whole was the material thing to be determined.

What the prior decisions establish is that where the value of a thing proper to be taxed cannot be ascertained by ordinary methods, its *use* may be referred to, and where its use *is* in inseparable combination with a whole of which it forms a part, the value of the whole may be referred to. What the court now apparently construes that decision to be, is that wherever the *use* of a thing in one State is in combination with other things outside of the State as a whole, its value for taxation may be determined by a reference to the value of the whole, *notwithstanding* that there is no difficulty in physical separation or in separation of ownership, and notwithstanding that the part within the State has the same full and perfect value *after* separation which it possessed before

combination.  As to railroads and telegraphs, the parts within one State cannot be sold, delivered and taken away by a purchaser without destroying the value.   Let it be imagined that this could be done, and that the price were easily ascertainable, can it be thought that the method of assessment adopted in respect to them would have been sanctioned?   It was the impossibility of this which was the ground and the sole ground of the decisions.

9.  There is manifest from the face of the opinion an impression on the part of the court that there is equity and justice in the methods sanctioned, and that the express companies are seeking to avoid just contributions.   This is most unfortunate. It should not be assumed where the question is alone as to the constitutionality of methods, for the records cannot contain the facts upon which such an assumption can either be justified or repelled.   The opinion contains this statement: "Considered as distinct subjects of taxation a horse is indeed a horse; a wagon, a wagon; a safe, a safe; a pouch, a pouch; but how is it that $23,430 worth of horses, wagons, safes and pouches produce $275,446 in a single year; or $28,438 worth $350,519?   The answer is obvious."   It is not intended, we assume, by this language to impute to the appellants an assertion of the fact implied by those interrogatories.   They mean that in the opinion of the court the horses, wagons, etc., sought to be taxed, are the real sources from which the large sums mentioned are derived; or that they may be justly so regarded for the purpose of taxation.   But ought not this to be reconsidered and retracted?   *Some* agency in producing these sums (for they are *gross* receipts) will, of course, be allowed to the physical labor of a large number of people, mere laborers, who must be paid out of the receipts; something more to the skill and superior talents of principals and subordinates who could earn, in various callings, large salaries, and some of them very large, and who must also be paid out of the receipts; something more to an accumulated fund derived from past profits which furnishes the public with an assurance of responsibility; something more to those habits of patronage, commonly called good will; and a great deal to the

services performed by the railroad companies, for it is a matter of common knowledge that the express companies are required to pay nearly one half of their gross receipts to the railroad companies for transportation. If fair and just minded men should deliberately estimate in the best possible manner the proportion to be awarded to each of these sources, would the amount properly to be ascribed to these horses, wagons, etc., be one particle more than is represented by their actual value as set forth in the returns? Certainly there is nothing perceived in these records which enables the court to say that there is, and the appellants assert most confidently that there is not.

There is evidently an impression that the contracts which express companies have with the railroads are sources of large profits. If this were the fact it is not perceived how it would affect the value of horses and wagons used by the companies; but the impression is erroneous. Railroad companies are. as exacting as other persons in the compensation they demand for their facilities, and just as exacting towards express companies as towards others.

But why is it that all these receipts are imputed to the horses and other personal property? If one piece of property can be *selected*, and the entire receipts be imputed to that, why cannot another piece be as well taken? Why cannot the real estate in Ohio be taken and the personal property be dropped, just as well as to take the personal and leave out of view the real estate? The real estate in the case of both the Adams and the American Company is of more than twice the value of its personalty, and yet that is not supposed, in the opinion, to contribute anything to the receipts.

10. It is said in the opinion that the appellants' returns of their property " did not take into account contracts for transportation and accompanying facilities." We are not advised whether the court means to suggest that such contracts constitute property which is subject to taxation by the States in which the railroads are situated.

(*a*) We submit in the first place that the statutes do not undertake to assess the railroad contracts of express companies

as property. They do not require the express companies to return such contracts to the assessing board or direct the board to estimate their value. The Supreme Court of Indiana has so construed the statute of that State. (Indiana Record, 59), and its construction is binding upon this court.

There is nothing in the opinion of the Supreme Court of Ohio to indicate that it regards the railroad contracts of the express companies as *property* to be taxed under the Nichols law. On the contrary in *Adams Express Co.* v. *State*, 44 N. E. Rep. 506, 508, they say:

" What is known as the 'Nichols law,' held constitutional in *State* v. *Jones*, 51 Ohio St. 492, imposes a tax upon *property only*, and does not impose any tax for the privilege of exercising a franchise in this State."

(*b*) We submit that the express companies' railroad contracts are not *property*. They do not create in the express companies any interest or estate in the railroads. They simply reduce to writing, for the purposes of convenience and certainty, the details of the service to be rendered by the railroads and the compensation to be paid therefor. The only property involved is the railroad, which belongs not to the express companies but to the railroad company, and which is taxed as such against the railroad company, and that too upon the basis of its value as affected by its earnings from express companies and other patrons.

The railroad facilities are no doubt valuable to the express companies; indeed, they are as essential to the conduct of the express business as they are to the conduct of business generally. But that does not make them *property*.

In *Exchange Bank of Columbus* v. *Hines*, 3 Ohio St. 1, the Supreme Court of Ohio held that the franchise of a bank was not *property* subject to taxation under the constitution of Ohio. The court, speaking by Bartley, C. J., said:

" Does a corporate franchise, in sober truth and reality, possess the essential qualities of property? It is said that the corporate franchise of a bank, conferring a peculiar legal capacity, and the high function of making and circulating paper money, is valuable — indeed, a thing of great value.

But value is not the distinguishing attribute of property. The right of suffrage is esteemed valuable; a public office, with its emoluments, is valuable; a license to keep a tavern, as formerly granted in this State, or a license to carry on any special business, which is prohibited without a special grant of authority from the Government, may be valuable; and a right to either of these things may be asserted and maintained in a court of justice, yet neither of them possess the essential qualities which constitute property. Our right to the free use and enjoyment of things which are in common, such as air, light, water, etc., is valuable; and our right to the free use of the public highways, and to many of the privileges and advantages derived from the Government, may be valuable, and may be maintained by legal process. Yet none of these things come within the denomination of property. Those things which constitute the subject-matter of private property, are such as the owner may exercise exclusive dominion over, in the use, enjoyment and disposal of them, without any control or diminution, save only by the laws of the land. 1 Wend. Bla. 138. It is a fundamental principle, that 'property, considered as an exclusive right to things, contains not only a right to use those things, but a right to dispose of them either by exchanging them for other things, or by giving them away to any other person, without any valuable consideration in return, or even of throwing them away, which is usually called relinquishing them.' Rutherford's Institutes; 20 Puffendorf, chap. 9, b. 7.

"It is said that capability of alienation or disposal, either by sale, devise or abandonment, is an essential incident to property." 2 Kent Com. 317, 3 Ohio St. 7, 8.

In *Ex parte Gilchrist*, 17 Q. B. D. 521, it was held that a power of appointment under a deed or will is not the "property" of the donee. Fry, L. J., said:

"No two ideas can well be more distinct the one from the other than those of 'property' and 'power.' This is a 'power' and nothing but a 'power.' A 'power' is an individual personal capacity of the donee of the power to do something. That it may result in property becoming vested in him is

immaterial; the general nature of the power does not make it property. The power of a person to appoint an estate to himself is, in my judgment, no more his 'property,' than the power to write a book or to sing a song. The exercise of any one of those three powers may result in property, but in no sense which the law recognizes are they 'property.' In one sense, no doubt they may be called the 'property' of the person in whom they are vested, because every special capacity of a person may be said to be his property; but they are not 'property' within the meaning of the word as used in law. Not only in law but in equity the distinction between 'power' and 'property' is perfectly familiar, and I am almost ashamed to deal with such an elementary proposition."

(c) It has been said several times in opinions delivered in this court that it is not within the power of a State to levy a tax against a person engaged in interstate commerce for the privilege of constructing or using an instrumentality of interstate commerce. *Cleveland, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 439, 445, 446. In *Postal Telegraph Cable Co.* v. *Adams*, 155 U. S. 688, 696, Mr. Chief Justice Fuller said:

" Doubtless, no State could add to the taxation of property according to the rule of ordinary property taxation, the burden of a license or other tax on the privilege of using, constructing or operating an instrumentality of interstate or international commerce, or for the carrying on of such commerce."

The express companies must use the railroads. For convenience they must reduce to writing the terms under which the railroads perform services for them. But the States can hardly be permitted to tax express companies for the privilege of employing railroads to render service in interstate commerce; or tax as property contracts which create in the express companies no interest or estate in property. But it is not necessary to enlarge upon this point, for the reason that, according to the decision itself, the contract can only be reached as being an inseparable part of the *whole plant* of the company, of which the horses, wagons, etc., are another

inseparable part.   If the notion of a *unity* falls, there can of course be no ground upon which the contracts can be made to add. anything to the value of the property assessed in Ohio. Account might just as well be taken of any other part of the property of the company as of the contracts referred to.   If the notion of unity is not maintainable, it follows necessarily, that any attempt to add to the valuation of the horses and wagons by a reference to anything except the intrinsic value of those articles themselves, must fail.

11. It must certainly be admitted that a *part* of an assumed unity cannot be valued by a reference to the value of the whole as determined by its productive use, unless the *whole* could be properly so assessed.   It must therefore follow that a State in taxing properties wholly within its limits may properly tax things *united in use* as a whole, by reference to the supposed productiveness of the whole.   Would it be endurable to tax *farms, cattle, hay, tools* and all as a *unit,* by a reference to productiveness, instead of by the ordinary method?   And is an express company more of a unit than ordinary farms?

12. Mr. Justice Brewer declared, in the opinion so often referred to by us, that if a taxable thing were situated within the limits of a State and *had a cash value,* the fact that such value was in part derived from the circumstance that it was an instrumentality of interstate commerce was immaterial; and he might with equal truth have added that if its value were, in part, derived from its use in inseparable connection with other property actually situated outside of the State, that circumstance would be immaterial.   In both instances it is the value only of property actually situated within the State which is taxed.

But let it be supposed that there are multitudes of the *same things,* situated in the *same State,* all equally *capable* of being used as the *same instrumentalities,* and all having an *ascertained ordinary value,* can an assessing board disregard *this* value and recur to the original elements which are supposed to make value, or to *one* of them, namely, *use,* and declare *another* value, twenty, or a hundred times greater?   If it can,

we are out of the domain of law, and without a defence against injustice and oppression.

The main defence against unlimited oppression in the name of taxation lies wholly in the *rule* which limits assessors to *ordinary* value. Even with that rule much oppression is possible, for in many instances just men do not agree as to the value when the ordinary rule is applied. But when the rule is discarded there is scarcely a limit to the possible abuse. It must be laid aside in *some* instances; but necessity alone should be held sufficient to justify it.

13. True, indeed, *use* is one of the elements which give property its value; for, unless a thing is *useful*, it has no value; but it is not the *actual use*, but the *capabilities of use* which constitute the effectual element. The value of horses in Ohio, aside from the effect of supply and demand, comes from the fact that they are capable of use for many different purposes. If they were capable of use for but one purpose, the demand would be infinitely smaller and the value less. The value of horses in Ohio is affected, therefore, by their capability of use in the express business, and every horse in Ohio is equally capable of this use, and their market value is based, in part, on that fact. Are the horses actually employed in this use any more *capable* of it than others?

The part situated in Ohio of a long line of railroad is *capable of no other use*, and there are no other *like* pieces of property situated in that State and capable of being applied to a multitude of other uses, which can be substituted in place of the piece actually used. If the case were otherwise such pieces of railroad would have a market value in Ohio. In that case could such market value be set aside and the roundabout and complicated method of ascertaining the value of the whole line, involving, in effect, taxation of property situated outside of the State, and burdening interstate commerce, be substituted in order to reach another and an artificial value?

*If the only use of horses, wagons, etc., in Ohio was in the express business, and they had no other value except that dependent upon such use, then the authority of the railroad cases*

*might more justly be invoked, and the rules there sanctioned applied.*

14. If we were to put the doctrine of the Ohio scheme in its scientific form, it would be as follows:

" It is true that the Ohio law authorizes the assessment only of the horses, wagons, etc., of the express companies; yet it *identifies* these by an *intellectual fiction* with an indivisible part of what is imagined by another intellectual fiction as the 'profit-producing plant' of the express companies; and, therefore, the value of that indivisible part is properly ascertained by reference to the value of the whole."

But we beg the attention of the court to the maxim that *intellectual fictions* are to be resorted to only for the purposes of *justice, convenience, certainty* and *order* in the law. Here they are resorted to (we must not say for the *intentional* purpose), but, certainly, with the necessary effect of bringing about the very opposite results, which is substantially the same thing.

And we beg further to say that if the State of Ohio is authorized, for the purposes of taxation, to *identify* by an intellectual conception the horses, wagons, etc., with an indivisible part of an *imagined thing*, it must be 'for the reason that such indivisible part of an imagined thing might *itself* have been *directly* subjected to taxation. Can this be possible?

But in the case of railroads and telegraphs no intellectual fictions are employed. The parts in one State are *real* indivisible parts of *real* wholes.

15. The rules approved in the railroad and telegraph cases are based upon *necessity*. The decision in these cases takes a rule founded on necessity and follows it and extends it, as a new point of departure, just as if it were founded on *principle*, and applies it where no necessity exists.

We respectfully ask the court to consider the certain error which results from such a method. A rule adopted from necessity is, *confessedly*, susceptible of no other defence, and therefore *wrong*. If it were defensible upon other grounds, it would be put upon such grounds, and necessity would not be resorted to. Hence, rules founded on necessity are *never to*

*be extended.* If other cases of necessity arise, that necessity will dictate its own rules.

Let us illustrate: The electric power works, in which many millions have been invested at Niagara Falls, may largely furnish their power by wires through Canada and Pennsylvania. Those States will have the right to tax the property situated in their respective limits. There will be no *market* or *ordinary* value to it. Consequently, the value must be ascertained by reference to other things. The rule of *mileage* will plainly not be applicable, nor that of gross receipts. Necessity will force the adoption of the best practicable method.

16. The sleeping car case stands upon necessity, but of a very different sort from that of the railroad and telegraph cases. The difficulty was occasioned by the circumstance that the cars were constantly moving from State to State; they had a physical *situs* in one as much as in another; but the whole could not be said to have a situs in any one. Some method of ascertaining the number and value of the cars in Pennsylvania was necessary. The method adopted was assailed on the ground that capital stock was not taxable. This objection was not good, for capital stock was held not to be taxed, but the cars only. If the method had been attacked on the true grounds it would have been perceived that there was a better way. The method adopted was thought to be effectual to determine the average number and value of cars used in Pennsylvania, and this seems not to have been contested by the Pullman Company. The better way would have been that suggested by Mr. Justice Matthews in *Marye* v. *Baltimore & Ohio Railroad*, 127 U. S. 117, 123, cited and approved by the court in the *Pullman cases*, to wit; to ascertain and appraise the average number of cars habitually used in the State.

If the horses, wagons, etc., of the express companies, were constantly on the move from one State to another, the decision in the *Pullman case* would have defended, not indeed the methods actually adopted in the express cases, but some method which would answer the necessities thus presented.

17. Taxation is administrative business, and the system must be workable; but the method sanctioned by the decision is wholly unworkable. It is wholly repugnant to all other parts of our systems of taxation, and would compel a revolution in them; and the oppression and injustice which would follow would be unendurable.

(*a*) What is to be the effect on the ordinary methods of assessment in the various States? If various pieces of property used in connection in different States are to be taxed as part of a unity in some of the States, it must be in all, and the separate value of the parts be disregarded, and real and personal be alike included in the unity. The practice now universal of taxing persons and corporations in the State of domicil for all personal and real estate except such as is physically situated elsewhere must be abandoned in the case of things *united in use.*

(*b*) Each State is the judge of the size of the part over which it has jurisdiction, and when the separate parts are ascertained they may (they certainly will) amount to twice, or thrice the whole, and, very probably, even more.

(*c*) Against this injustice and oppression the law affords no defence. There is no common tribunal which can determine the value of the whole and of the separate parts.

If an appeal be taken to this court, the answer will be "We cannot review determinations of fact," and yet the whole mischief lies in determinations of fact.

In one State the proportion will be reached by a comparison of *mileage;* in another by a comparison of *gross receipts.* Upon what principle can this court declare that one is wrong and the other right?

(*d*) An avalanche of litigation impossible to be dealt with will be the result. The victims will of course resort to this court before submitting to absolute ruin. The exactions they will show will shock the sense, and yet no fraud can be proved, and no rule invoked by which the exactions can be reduced to just sums. And the necessities for relief will, as they always do, subject just and established rules to a strain under which they will break down.

(*e*) It is taxation without representation, with all its evils. The citizens of Ohio can compel each other to establish justice and equality as between themselves. But what means have the citizens of New York to resort to, to compel justice at the hands of the citizens of Ohio?

*Second.* The extreme importance and far-reaching effect of the decision which has been announced as a determination upon some of the most fundamental principles of constitutional law.

1. The Ohio method of taxation, once sustained by this court, will be followed in every State in which the express companies carry on their operations, even in the State of domicil, and as to such companies, at least, two practices, one or the other of which have heretofore been universally adopted, can no longer be followed, at least without the inevitable consequence of double taxation. These practices are (1) that of taxing corporations in the State of their domicil upon the value of their capital stock, excepting therefrom the value of tangible property actually situated in another jurisdiction ; (2) that of taxing corporations in the State of their domicil, upon the value of their property in that State without reference to capital stock, and assuming that all intangible property has its situs for the purpose of taxation within such State. We say that these practices must be abandoned or double taxation will be the result. This is an understatement. Treble or quadruple taxation will be the more probable consequence. And there will be no way of preventing this, for the assessments in the several States (and there may be forty) will be entirely independent of each other, with no common supervising authority to correct their errors or reconcile their inconsistencies, and there will be an irresistible temptation in each State to compel the citizens of other States to pay as large a share as possible of their own expenditures.

2. It seems also to follow that States favorably situated in respect to interstate commerce, like New Jersey, Pennsylvania, Ohio and Indiana, will be easily enabled by an application of this method to compel enormous contributions from the citizens of other States for the natural facilities which passage

through their territories affords; contributions, to which, in an international point of view, no objection can be made, but a surrender of which it was one of the prime objects of the Constitution to compel in consideration of other advantages afforded by union, and which power those States certainly did surrender upon coming into the Union.

3. These consequences cannot be limited to the case of the express companies, but must be applied in all instances where companies, or even individuals, carry on business operations in different States, and whose property can be justly said to be blended together by what is called in the decision " a unity of use."

4. The framers of the Constitution intended to create what would be, in substance, one country; at the same time they could not dispense with the existence of sovereign States. And as a substitute for the ordinary remedies, as between sovereign States, of war and retaliation (resorts no longer admissible) they provided the following safeguards : (1) First and foremost, the fundamental principle that the property of the citizen of one State could not be taxed by another unless it had an actual situs within the latter.  (2) By making it impossible that any State impose any burden, by way of taxation or otherwise, upon any of the instrumentalities of interstate commerce.  (3) By declaring that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."  These provisions, however, would be of comparatively little value if their interpretation and enforcement were allowed to rest with the States themselves; and therefore, another provision was added, namely : (4) a power to transfer, in certain cases, judicial proceedings in the States to the courts of the United States, and in other cases to subject the decisions of the former to review by the latter. These latter safeguards, quite efficient in many cases, would be substantially powerless in relation to the matter of taxation. Proceedings to assess property cannot be transferred, and indirect review is effective only when distinct principles of law are violated, whereas, in the determination of the value of property, opinion and discretion are the effective elements and

the exercise of these by the state officers, cannot be effectually supervised, checked or restrained. If an attempt is made to tax the property of a non-resident not having an actual situs in the State, the safeguard is entirely effectual. If the ordinary rules limiting assessment to value, as value is ordinarily understood, are applied, a protection is secured equal to that which a citizen has in cases of the assessment of his property in his own State. If these rules of valuation are allowed to be disregarded or superseded by another as to which there is no safeguard, a citizen of one State has no defence against the exactions which may be imposed upon him by another. These United States will cease, in many of the most important respects, to be *one country*, but will become *independent nations*. And this, too, without the protection which independent nations have against each other in the mutual dread of retaliation of war.

*Third.* The immediate practical importance of the decision in its direct effect upon the express companies.

In the deliberate judgment of those companies the stroke is a crushing one. They are left at the mercy of the mere caprice of assessing boards all over the country; for this system of taxation establishes no standard or criterion by which the amount of the assessment can be tested or restrained. It may be a half million, as in Ohio, or a million and a half, as in Kentucky. This year it is a half a million in Ohio, but she is not likely to be content with less than Kentucky, and next year Ohio may make it two millions, and the courts will be powerless to afford relief.

The express companies concede that it is not unjust, in view of the small amount of property which they use in their business, as compared with the police protection which they receive, to lay a tax upon them, in addition to a property tax. Many States, including Ohio, levy such additional tax. Where it is laid by a reasonably definite rule, such as percentage upon gross receipts from state business, the companies have the protection of law; but the evils of a system, such as the Nichols law, which sets up no standard that can be tested by any rule, are intolerable.

1. That every State will resort to this new device, now that it has been pronounced legal, must of course be regarded as certain. A proper view of their own interests would require them to do so. The complaints of the citizens in each State at the burdens of taxation imposed upon them, growing louder and louder every year as that burden increases, will compel all assessing officers to impose as much of the burden as possible upon those whose complaints they can afford to disregard. What limit, indeed, can be placed upon the extent to which the people of a State will compel foreigners to bear the burden of their expenditures, if they have neither war nor judicial interference to apprehend?

The device of Ohio was immediately imitated by Indiana and Kentucky even before its validity was tested. That other States did not follow it is imputable only to the circumstance that they believed this court would promptly condemn it. But immediately upon announcement of this decision the legislative machinery has been started; and while these words are being written intelligence has come that bills for similar schemes have been introduced into the legislatures of more than one State.

*Fourth.* The novelty of the questions discussed, and of the points necessarily determined by the judgment.

Upon this point no observations are needed. It is believed that no one will say that such a method of taxation has ever heretofore been practised in any civilized country, in respect to property having a market value and distinctly separable without affecting that value from the business with which it is connected.

*Fifth.* The fact that under the circumstances such failure on the part of counsel is not without reasonable excuse.

The insufficiency of the argument of the appellants was twofold: first, in not embracing a review of authorities which it now appears by the opinion of the court are deemed decisive of the question; second, in not subjecting the theory of a *unity of use* to a thorough scrutiny, showing the grave objections to it.

The excuse for the omission of a review of the prior

decisions is this: The cases of railroad and telegraph com-
panies are, it will be agreed, to say the least, very different
from that of express companies. They are assimilated to it in
the opinion of the court on the ground that the property of the
latter constitutes a united profit-producing plant, an idea which,
it will be admitted, has never before been entertained by this
court. The extreme differences between the case of express
companies and the class of companies above mentioned would
alone have justified a hesitancy on the part of counsel in
bringing into the discussion the decisions in the latter class
of cases as being too remote. But, more than this, this court
had in substance declared them inapplicable. It had said, in
*Pacific Express Co.* v. *Seibert*, 142 U. S. 339, 354: "On the
other hand, express companies, such as are defined by this
act, have no tangible property of any consequence subject to
taxation under the general laws. There is, therefore, no way
by which they can be taxed at all unless by a tax upon their
receipts for business transacted"; that express companies
were "entirely dissimilar in vital respects, as regards the
purposes and policy of taxation, from railroad companies and
the like owning a large amount of tangible and other prop-
erty subject to taxation under other and different laws and
upon other and different principles," and that "in the nature
of things, and irrespective of the definitive legislation in
question, they belong to different classes."

The opinion of the court disposes of *Pacific Express Co.* v.
*Seibert* by saying that Mr. Justice Lamar's reference was "to
the legislation of the State of Missouri, and the scheme of
taxation under consideration here was not involved in any
manner." But the objection there made to that legislation
(which imposed a tax on the gross receipts of the express
company) was that the statute violated the Fourteenth Amend-
ment in denying to express companies the equal protection of
the laws, because it did not impose a similar tax upon other
persons, such as railroad companies, engaged in similar occu-
pations. The answer of this court to that contention was, in
the "language of Mr. Justice Lamar, that express companies
were *entirely dissimilar* as regards the purposes and policy

of taxation from railroad companies," and that " in the *nature of things*, and irrespective of the *definitive legislation of Missouri*, they belonged to *different* classes " ; and because they belonged to different classes, the court held that the statute of Missouri, which imposed a tax upon them, that was not laid on railroads, was not in contravention of the provision of the Federal Constitution, which vouchsafes the equal protection of the laws.

It is now, however, declared by the court that the prior decisions of the court in the railroad, telegraph and sleeping car company cases do decide, in principle at least, the very point raised in the present cases, and this opinion is reached without the benefit to the appellants in the present case of a close review of those decisions for the purpose of showing that such is not the fact.

As to the omission to scrutinize the foundation of the theory of a *unity of use* as a basis of taxation, the reason is the same. It had never been stated, in terms, by this court. In the *Gloucester Ferry case* it had been urged by the attorney general of Pennsylvania under the plea of a " homogeneous unit," 114 U. S. 196, 201, and repudiated by the court. The railroad, telegraph and sleeping car decisions had made no allusion to it. These were put on other grounds stated in the review hereto annexed. The notion is the invention of the Supreme Court of Ohio. How could counsel think it necessary to discuss such a theory when it had been so plainly intimated by this court that express companies, at least, could not be dealt with in such a way ?

*Sixth.* The denial of the equal protection of the laws.

If property generally in the State of Ohio were assessed for taxation on the basis of the Nichols law, the express companies would have no substantial ground of complaint, because, in that event, the property of all other owners would be valued for taxation on the same basis as that of express companies, and while the amount of all assessments would be tremendously increased, the rate would be proportionately reduced, and the proportion of taxes paid by the express companies would not be increased. The practical injustice of the Nichols

law lies in the fact that the property of express companies is valued for taxation according to the principles of that law, while all other property in the State is valued without reference to the earnings of the owner or the profitableness of the use to which he puts his property. Merchants, manufacturers, banks, brokers, newspapers, gas companies, street railway ·companies, indeed all persons and corporations engaged in business in the State, except the companies covered by the Nichols law, are taxed without the slightest reference to the profits of their business. The market value of the shares of a bank, for instance, may be greatly in excess of the value of the bank's assets, owing to good will and a large deposit account, but its shares are assessed upon the simple basis of the cash value of the assets of the bank, after deducting its liabilities. The market value of the shares of a newspaper company may, on account of heavy circulation, largely exceed the value of the assets of the company, but it is taxed only upon the ordinary cash value of its printing presses and other appliances. In assessing a merchant or manufacturer for taxation, no inquiry is made as to the profitableness of his business, or if the business is conducted by a corporation, as to the par or market value of its shares. The assessment is laid upon the ordinary cash value of the tangible assets of the business.

All owners are not assessed by the same assessing officer or board, but the *basis of valuation* is the same, and absolutely without exception, except under the Nichols law. It was for the purpose of pointing out this unjust discrimination of the Nichols law that we printed in our Exhibit Book all of the statutes of Ohio governing the taxation of personal property.

We respectfully submit that the court has mistaken those statutes in assuming in the language of the opinion that "the policy pursued in Ohio is to classify property for taxation," and that "property of different sorts is classified under various statutory provisions for the purpose of assessment and taxation." There is not and never has been, in the State of Ohio, any classification affecting the *method* or *basis valuation* of

property for taxation except that introduced by the Nichols law.

The case of *Wagoner* v. *Loomis*, 37 Ohio St. 571, cited by the court in support of its statement, involved the taxation of shares of a national bank; but it will be seen by referring to the opinion in that case, or to the statute providing for the assessment of such shares, that they are estimated for purposes of taxation, not at their par or market price, but by taking the ordinary cash value of the bank's assets and dividing the sum by the number of shares.

We have never meant to dispute the rule so often announced, and reaffirmed in the opinion, that the Fourteenth Amendment does not prevent a just classification of property for taxation. What we complain of is the adoption of a method of *valuation* which applies to those covered by the Nichols law and to no other owners, with the effect of increasing the assessments against express companies twenty-fold.

A motion for a reargument does not require, and the pressure under which it is made does not permit elaboration. The above suggestions are but a part of those which may properly be urged; but they are the principal ones. Are they not enough to justify the indulgence of a further full opportunity to complete them by weaving them into a connected argument such as the court has not yet heard, designed to show that the scheme of taxation framed under these recent laws is not consistent with the Constitution of the United States?

Respectfully submitted,

JAMES C. CARTER,

LAWRENCE MAXWELL, JR.,

Counsel.

REVIEW OF SOME OF THE AUTHORITIES RELIED UPON IN THE OPINION OF THE COURT.

*Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18.

In this case the taxes challenged were levied under statutes of Pennsylvania, imposing, in form, taxes on the capital stock of corporations incorporated by the laws of Pennsylvania or

of any other State and doing business in Pennsylvania, to be computed on a certain percentage of dividends made and declared. It was *treated* as being not a tax on capital stock, but on property. The tax was made to depend partly upon the value of the capital stock, and partly on the amount of dividends, and the tax would, therefore, be dependent in part upon the value of the capital stock as ascertained in the manner provided by the act. So far as appears from the case the only questions to be determined were those stated by Mr. Justice Gray at the opening of his opinion, which was that of the court. "Upon this writ of error whether this tax was in accordance with the law of Pennsylvania is. a question on which the decision of the highest court of the State is conclusive. The only question of which this court has jurisdiction is whether the tax was in violation of the clause of the Constitution of the United States granting to Congress the power to regulate commerce among the several States. The plaintiff in error contends that its cars could be taxed only in the State of Illinois, in which it was incorporated and had its principal place of business." We understand by this that the plaintiff in error took two grounds: First, that the taxation of such railroad cars at all, when in actual use, was a burden upon interstate commerce, and therefore void. Second, that if such cars were subject to taxation at all they could be taxed only where the corporation had its domicil, which was in Illinois.

The point involved in our express cases is, whether in assessing the value of the personal property of an express company, which has confessedly an ascertainable market value, such market value can be totally disregarded and superseded by reference to another criterion which has no relation whatever to value, as that term is commonly understood, and especially by reference to the value of a right to prosecute interstate commerce.

How these points can be supposed to have been determined by the discussion and determination of the questions above stated, as arising in the case of the Pullman Car Company against Pennsylvania, is not easy to see. Upon perusing the opinion in that case, it will be perceived that it begins by an

emphatic statement and maintenance of the rule that property is not subject to taxation by a State unless it has an actual situs therein.   It was manifest that the sleeping cars had an actual situs outside of the place of domicil of the company owning them, and therefore that they were justly taxable outside of that State.   The puzzle was that they had this actual situs as much in one of several other States as another. Each might put in a claim that a situs was within its own territory exclusively.   Such exceptional cases of course justify a resort to exceptional methods.   The real problem was to ascertain how much of this sleeping car property was fairly to be treated as having a situs in Pennsylvania.   The actual method which was sanctioned was not subjected to discussion. What was insisted upon by the company was that *no* method was allowable.   If the horses, wagons, etc., used by the express companies in Ohio had been, in point of fact, used in a similar manner in half a dozen different States, the decision in the sleeping car case would have justified the adoption of some equitable method of ascertaining to how many of them a situs in Ohio should be assigned.   Upon the other point, as to whether taxing these sleeping cars was imposing a burden upon interstate commerce, there is nothing certainly opposed to our contention.   We have never asserted, in the remotest degree, that the horses, wagons, harness, etc., of the express companies in Ohio are in any way relieved from taxation because employed in interstate commerce.

If the sleeping cars, the taxation of which was the subject of dispute in this case, had been entirely confined in their operation and use to the State of Pennsylvania, and had been proved to be of the value of $10,000, and had, by a reference to the capital stock of the Pullman Car Company and the proportion of its lines within the State to that outside of it, been assessed at the value of $200,000 each, and the question had arisen as to the validity of such an assessment, a decision sustaining the assessment would have been authority in this case.   The appellants' counsel cannot help thinking that if such had been the question, the taxation sustained in that case would have met a different fate.

There is indeed, in the opinion of the court, the following statement: "The tax on the capital of the corporation, on account of its property within the State, is in substance and effect, a tax on that property," but this statement cannot be regarded as any part of the decision, because no issue was joined on it, nor was it subjected to any discussion whatever, as will be seen by the observation which immediately follows, namely: "This is not only admitted, but insisted on, by the plaintiff in error," that is to say, the opinion deals with the case of the plaintiff in error upon its own avowed assumptions.

It may be asked, however, if we admit the correctness of the proposition thus stated by the court. We do admit it fully in the sense in which it is declared in one of the two cases cited which affirm it. Nothing is more common than attempts by a State, where they are precluded by constitutional principles from taxing directly a particular item of property, to reach the object indirectly by imposing a tax upon some other thing which includes it or is dependent upon it. Wherever such an attempt is made it ought to be denounced and defeated. The first case referred to by Mr. Justice Gray, *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, was one of that character. The State of Pennsylvania wanted to tax a ferry boat belonging to a New Jersey corporation, which was employed on a ferry across the Delaware River, and which was, of course, from time to time, within the territory of Pennsylvania. It could not, it was admitted, do that directly. It sought to do it indirectly by attempting to impose a tax upon the capital stock of the New Jersey Company. This court promptly declared, as it ought to have done, that that was in substance and effect the same thing. What better authority could be found than this to support the contention of the appellants? The State of Ohio had, in every way which ingenuity could suggest, taxed everything which it had a right to tax against these express companies. It wanted to tax the capital stock. It knew that this could not be done directly. It sought to accomplish the same thing indirectly by imputing an utterly fictitious value to personal property owned by that company in the State and subject to

taxation. What ought to be said in this case (a proposition laid down by Mr. Justice Gray in the case of *Pullman's Car Company* v. *Pennsylvania,* abundantly sustained by the *Gloucester Ferry Co.* v. *Pennsylvania,* and by many other cases) is, that the State of Ohio, not having the right to tax the capital stock of these express companies directly, must not do it by the device which it has sought to employ.

It should hardly be necessary to say, however, that when a court stigmatizes an attempt by a State to tax specific property within it which it has no right to tax, by saying that an indirect effort to accomplish the same thing by an attempt to tax capital stock cannot be permitted, it does not mean, by any means, that the taxing of specific property and the taxing of capital stock are so far identical that one may properly be resorted to wherever the other can be employed. Specific property belonging to a corporate body may have an actual situs within a State, and therefore be the subject of taxation, but it by no means follows from this that the capital stock or some portion of it, of such corporation, has such actual situs.

The case of *Maine* v. *Grand Trunk Railway,* 142 U. S. 217, was, as the court declares in the beginning of its opinion, "*an excise tax* upon the defendant corporation for *the privilege of exercising its franchises* within the State of Maine." The subject-matter of the tax was confessedly one within the taxing power of the State. There must necessarily, therefore, be some allowable mode for ascertaining the value of that privilege. The mode adopted was by a reference *to comparative gross receipts.* What error can be suggested in such a method, especially when, as in Maine, it was the one adopted as to domestic corporations of the same character? How can such a case, which was not that of a tax upon specific property, nor one in which the method was by a reference to the value of capital stock, nor one in which the amount of the tax was dependent upon the supposed value of the subject taxed, nor one in which, if it were so dependent, the subject taxed had a fixed value, be regarded as an authority upon the questions in these express company cases?

In the case of *Pittsburgh, Cincinnati &c. Railway* v. *Backus,*

154 U. S. 421, the tax assailed was one upon that part of the railroad property situated within the State of Indiana. The law under which the tax was imposed did not lay down any rule, as in these express company cases, for the *guidance* of the assessing board in determining value, but required it to assess it at its "actual cash value." It did, however, require statements which indicated that the board might and should look to the value of the whole road in determining the value of the part.

This mode of assessing property of a railroad company, undoubtedly within the State, was put in this case, as in a prior case cited in the opinion, upon its true ground *necessity*. Are these cases authority for another in which the whole basis of the decision is wanting?

The next case cited in the opinion of the court is that of the *Cleveland, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 439. The special attention of the court is respectfully called to the opinion. It was a case of taxation of railroad property under the same law as in the case last above mentioned, but the validity of the method was more emphatically assailed in argument, and was considered by Mr. Justice Brewer with great candor and deliberation. He was evidently not insensible to the abuses possible in the case of the imposition by one State of taxes upon the property of citizens of another State; but he properly recognizes the fact that it was right and indeed necessary that such taxes should be imposed. He upheld this method of assessment upon the obvious ground that it was the *true and natural method* which the individuals would employ, and was indeed the only practicable method; and that either such method *must* be adopted or the property be suffered to go exempt of taxation. He insisted that in the case of *such* property "there is no pecuniary value outside of that which results from such use"; and that it was impossible to disintegrate the value of that portion of the road within Indiana. He affirmed the rule that no State must put any burden in any way upon interstate commerce, but declared that "the taxation of property *according to the ordinary rule of property taxation*" did not violate that rule.

We respectfully invite the attention of the court to the whole of this opinion, and especially to so much of it as is on pages 443–447. Is it possible to think that if in that case it had appeared that there was "outside of the use to which the property was put" a distinct and clearly ascertainable pecuniary value, that the property could be separated from the use to which it was put, and bear the same value which it possessed before it was put to that use, that such property was *ordinarily* taxed in a wholly different way, and that the whole field of invasion of these rules which forbid the taxation of interstate commerce or of property outside of the jurisdiction, would be thrown open if the ordinary method should be displaced, the decision would not have been the other way?

The last case cited by the court is that of the *Western Union Telegraph Co.* v. *Taggart,* 163 U. S. 1. The decision was to the effect that the value of the easements, poles, wires, etc., of a *telegraph company* within a State was subject to the same rules of taxation as are applicable to the case of a railroad company. Nothing is perceived in this doctrine which has any direct bearing. It is relevant however in one respect, namely, that for the true defence of the principle of taxation as applied to the cases of railroads, it quotes very largely from the opinion of the court read by Mr. Justice Brewer, in the case of *Cleveland, Cincinnati &c. Railway* v. *Backus,* 154 U. S. 439, above referred to, and adopts the reasoning laid down in that opinion.

Mr. Justice Brewer delivered the opinion of the court.

We have had before us at the present term several cases involving the taxation of the property of express companies, some coming from Ohio, some from Indiana, and one from Kentucky; also a case from the latter State involving the taxation of the property of the Henderson Bridge Company. The Ohio and Indiana cases were decided on the 1st of February. (165 U. S. 194.) Petitions for rehearing of those cases have been presented and are now before us for consideration.

The importance of the questions involved, the close division

in this court upon them, and the earnestness of counsel for the express companies in their original arguments, as well as in their briefs on this application, lead those of us who concurred in the judgments to add a few observations to what has hitherto been said.

Again and again has this court affirmed the proposition that no State can interfere with interstate commerce through the imposition of a tax, by whatever name called, which is in effect a tax for the privilege of transacting such commerce. And it has as often affirmed that such restriction upon the power of a State to interfere with interstate commerce does not in the least degree abridge the right of a State to tax at their full value all the instrumentalities used for such commerce.

Now the taxes imposed upon express companies by the statutes of the three States of Ohio, Indiana and Kentucky are certainly not in terms "privilege taxes." They purport to be upon the property of the companies. They are, therefore, not, in form at least, subject to any of the denunciations against privilege taxes which have so often come from this court. The statutes grant no privilege of doing an express business, charge nothing for doing such a business and contemplate only the assessment and levy of taxes upon the property of the express companies situated within the respective States. And the only really substantial question is whether, properly understood and administered, they subject to the taxing power of the State property not within its territorial limits. The burden of the contention of the express companies is that they have within the limits of the State certain tangible property, such as horses, wagons, etc.; that that tangible property is their only property within the State; that it must be valued as other like property, and upon such valuation alone can taxes be assessed and levied against them.

But this contention practically ignores the existence of intangible property, or at least denies its liability for taxation. In the complex civilization of to-day a large portion of the wealth of a community consists in intangible property, and there is nothing in the nature of things or in the limitations of the Federal Constitution which restrains a State from tax-

ing at its real value such intangible property. Take the simplest illustration: B, a solvent man, purchases from A certain property, and gives to A his promise to pay, say, $100,000 therefor. Such promise may or may not be evidenced by a note or other written instrument. The property conveyed to B may or may not be of the value of $100,000. If there be nothing in the way of fraud or misrepresentation to invalidate that transaction, there exists a legal promise on the part of B to pay to A $100,000. That promise is a part of A's property. It is something of value, something on which he will receive cash, and which he can sell in the markets of the community for cash. It is as certainly property, and property of value, as if it were a building or a steamboat, and is as justly subject to taxation. It matters not in what this intangible property consists — whether privileges, corporate franchises, contracts or obligations. It is enough that it is property which though intangible exists, which has value, produces income and passes current in the markets of the world. To ignore this intangible property, or to hold that it is not subject to taxation at its accepted value, is to eliminate from the reach of the taxing power a large portion of the wealth of the country. Now, whenever separate articles of tangible property are joined together, not simply by a unity of ownership, but in a unity of use, there is not infrequently developed a property, intangible though it may be, which in value exceeds the aggregate of the value of the separate pieces of tangible property. Upon what theory of substantial right can it be adjudged that the value of this intangible property must be excluded from the tax lists, and the only property placed thereon be the separate pieces of tangible property?

The first question to be considered therefore is whether there is belonging to these express companies intangible property — property differing from the tangible property — a property created by either the combined use or the manner of use of the separate articles of tangible property, or the grant or acquisition of franchises or privileges, or all together. To say that there can be no such intangible property, that it is

something of no value, is to insult the common intelligence of every man. Take the Henderson Bridge Company's property, the validity of the taxation of which is before us in another case. The facts disclosed in that record show that the bridge company owns a bridge over the Ohio, between the city of Henderson in Kentucky and the Indiana shore, and also ten miles of railroad in Indiana; that that tangible property — that is, the bridge and railroad track — was assessed in the States of Indiana and Kentucky at $1,277,695.54, such, therefore, being the adjudged value of the tangible property. Thus the physical property could presumably be reproduced by an expenditure of that sum, and if placed elsewhere on the Ohio River, and without its connections or the business passing over it or the franchises connected with it, might not of itself be worth any more. As mere bridge and tracks, that was its value. If the State's power of taxation is limited to the tangible property, the company should only be taxed in the two States for that sum, but it also appears that it, as a corporation, had issued bonds to the amount of $2,000,000, upon which it was paying interest; that it had a capital stock of $1,000,000, and that the shares of that stock were worth not less than $90 per share in the market. The owners, therefore, of that stock had property which for purposes of income and purposes of sale was worth $2,900,000. What gives this excess of value? Obviously the franchises, the privileges the company possesses — its intangible property.

Now, it is a cardinal rule which should never be forgotten that whatever property is worth for the purposes of income and sale it is also worth for purposes of taxation. Suppose such a bridge were entirely within the territorial limits of a State, and it appeared that the bridge itself cost only $1,277,000, could be reproduced for that sum, and yet it was so situated with reference to railroad or other connections, so used by the travelling public, that it was worth to the holders of it in the matter of income $2,900,000, could be sold in the markets for that sum, was therefore in the eyes of practical business men of the value of $2,900,000, can there be any doubt of the State's power to assess it at that sum,

and to collect taxes from it upon that basis of value? Substance of right demands that whatever be the real value of any property, that value may be accepted by the State for purpose of taxation, and this ought not to be evaded by any mere confusion of words. Suppose an express company is incorporated to transact business within the limits of a State, and does business only within such limits, and for the purpose of transacting that business purchases and holds a few thousands of dollars' worth of horses and wagons, and yet it so meets the wants of the people dwelling in that State, so uses the tangible property which it possesses, so transacts business therein that its stock becomes in the markets of the State of the actual cash value of hundreds of thousands of dollars. To the owners thereof, for the purposes of income and sale, the corporate property is worth hundreds of thousands of dollars. Does substance of right require that it shall pay taxes only upon the thousands of dollars of tangible property which it possesses? Accumulated wealth will laugh at the crudity of taxing laws which reach only the one and ignore the other, while they who own tangible property, not organized into a single producing plant, will feel the injustice of a system which so misplaces the burden of taxation.

A distinction must be noticed between the construction of a state law and the power of a State. If a statute, properly construed, contemplates only the taxation of horses and wagons, then those belonging to an express company can be taxed at no higher value than those belonging to a farmer. But if the State comprehends all property in its scheme of taxation, then the good will of an organized and established industry must be recognized as a thing of value. The capital stock of a corporation and the shares in a joint stock company represent not only the tangible property, but also the intangible, including therein all corporate franchises and all contracts, privileges and good will of the concern.

Now, the same reality of the value of its intangible property exists when a company does not confine its work to the limits of a single State. Take, for instance, the Adams Express Company. According to the return filed by it with the audi-

tor of the State of Ohio, as shown in the records of these cases, its number of shares was $120,000, the market value of each $140 to $150. Taking the smaller sum, gives the value of the company's property taken as an entirety as $16,800,000. In other words, it is worth that for the purposes of income to the holders of the stock and for purposes of sale in the markets of the land. But in the same return it shows that the value of its real estate in Ohio was only $25,170; of real estate owned outside of Ohio $3,005,157.52; or a total of $3,030,327.52; the value of its personal property in Ohio $42,065; of personal property outside of Ohio $1,117,426.05; or a total of $1,159,491.05, making a total valuation of its tangible property $4,189,818.57, and upon that basis it insists that taxes shall be levied. But what a mockery of substantial justice it would be for a corporation, whose property is worth to its stockholders for the purposes of income and sale $16,800,000, to be adjudged liable for taxation upon only one fourth of that amount. The value which property bears in the market, the amount for which its stock can be bought and sold, is the real value. Business men do not pay cash for property in moonshine or dreamland. They buy and pay for that which is of value in its power to produce income, or for purposes of sale.

It is suggested that the company may have bonds, stocks or other investments which produce a part of the value of its capital stock, and which have a special situs in other States or are exempt from taxation. If it has, let it show the fact. Courts deal with things as they are, and do not determine rights upon mere possibilities. If half of the property of the Adams Express Company, which by its own showing is worth $16,000,000 and over, is invested in United States bonds, and therefore exempt from taxation, or invested in any way outside the business of the company and so as to be subject to purely local taxation, let that fact be disclosed, and then if the State of Ohio attempts to include within its taxing power such exempted property, or property of a different situs, it will be time enough to consider and determine the rights of the company. That if such facts exist they must be taken into consideration by a State in its proceedings under such

tax laws as are here presented has been heretofore recognized and distinctly affirmed by this court. *Pittsburgh, Cincinnati &c. Railway Co.* v. *Backus,* 154 U. S. 421, 443; *Western Union Telegraph Co.* v. *Taggart,* 163 U. S. 1, 23; *Adams Express Co.* v. *Ohio,* 165 U. S. 194, 227. Presumably all that a corporation has is used in the transaction of its business, and if it has accumulated assets which for any reason affect the question of taxation, it should disclose them. It is called upon to make return of its property, and if its return admits that it is possessed of property of a certain value, and does not disclose anything to show that any portion thereof is not subject to taxation, it cannot complain if the State treats its property as all taxable.

But where is the situs of this intangible property? The Adams Express Company has, according to its showing, in round numbers $4,000,000 of tangible property scattered through different States, and with that tangible property thus scattered transacts its business. By the business which it transacts, by combining into a single use all these separate pieces and articles of tangible property, by the contracts, franchises and privileges which it has acquired and possesses, it has created a corporate property of the actual value of $16,000,000. Thus, according to its figures, this intangible property, its franchises, privileges, etc., is of the value of $12,000,000, and its tangible property of only $4,000,000. Where is the situs of this intangible property? Is it simply where its home office is, where is found the central directing thought which controls the workings of the great machine, or in the State which gave it its corporate franchise; or is that intangible property distributed wherever its tangible property is located and its work is done? Clearly, as we think, the latter. Every State within which it is transacting business and where it has its property, more or less, may rightfully say that the $16,000,000 of value which it possesses springs not merely from the original grant of corporate power by the State which incorporated it, or from the mere ownership of the tangible property, but it springs from the fact that that tangible property it has combined with contracts, franchises and privileges into a single

unit of property, and this State contributes to that aggregate value not merely the separate value of such tangible property as is within its limits, but its proportionate share of the value of the entire property. That this is true is obvious from the result that would follow if all the States other than the one which created the corporation could and should withhold from it the right to transact express business within their limits. It might continue to own all its tangible property within each of those States, but unable to transact the express business within their limits, that $12,000,000 of value attributable to its intangible property would shrivel to a mere trifle.

It may be true that the principal office of the corporation is in New York, and that for certain purposes the maxim of the common law was "*mobilia personam sequuntur*," but that maxim was never of universal application, and seldom interfered with the right of taxation. *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, 22. It would certainly seem a misapplication of the doctrine expressed in that maxim to hold that by merely transferring its principal office across the river to Jersey City the situs of $12,000,000 of intangible property for purposes of taxation was changed from the State of New York to that of New Jersey.

It is also true that a corporation is, for purposes of jurisdiction in the Federal courts, conclusively presumed to be a citizen of the State which created it, but it does not follow therefrom that its franchise to be is for all purposes to be regarded as confined to that State. For the transaction of its business it goes into various States, and wherever it goes as a corporation it carries with it that franchise to be. But the franchise to be is only one of the franchises of a corporation. The franchise to do is an independent franchise, or rather a combination of franchises, embracing all things which the corporation is given power to do, and this power to do is as much a thing of value and a part of the intangible property of the corporation as the franchise to be. Franchises to do go wherever the work is done. The Southern Pacific Railway Company is a corporation chartered by the State of Kentucky, yet within the limits of that State it is said to have no tangible

property and no office for the transaction of business. The vast amount of tangible property which by lease or otherwise it holds and operates, and all the franchises to do which it exercises, exist and are exercised in the States and Territories on the Pacific Slope. Do not these intangible properties — these franchises to do — exercised in connection with the tangible property which it holds, create a substantive matter of taxation to be asserted by every State in which that tangible property is found?

It is said that the views thus expressed open the door to possibilities of gross injustice to these corporations, through the conflicting action of the different States in matters of taxation. That may be so, and the courts may be called upon to relieve against such abuses. But such possibilities do not equal the wrong which sustaining the contention of the appellant would at once do. In the city of New York are located the headquarters of a corporation, whose corporate property is confessedly of the value of $16,000,000 — a value which can be realized by its stockholders at any moment they see fit. Its tangible property and its business is scattered through many States, all whose powers are invoked to protect its property from trespass and secure it in the peaceful transaction of its widely dispersed business. Yet because that tangible property is only $4,000,000 we are told that that is the limit of the taxing power of these States. In other words, it asks these States to protect property which to it is of the value of $16,000,000, but is willing to pay taxes only on the basis of a valuation of $4,000,000. The injustice of this speaks for itself.

In conclusion, let us say that this is eminently a practical age; that courts must recognize things as they are and as possessing a value which is accorded to them in the markets of the world, and that no finespun theories about situs should interfere to enable these large corporations, whose business is carried on through many States, to escape from bearing in each State such burden of taxation as a fair distribution of the actual value of their property among those States requires.

. The petition for a rehearing is

*Denied.*