UNITED STATES REFRACTORIES CORPORATION AND KISTLER LAND & IMPROVEMENT CO., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5642, 12355. Promulgated December 19, 1927.

R. P. *Smith, Esq.*, for the petitioners.

*Thos. P. Dudley, Jr., Esq.*, and *Granville S. Borden, Esq.*, for the respondent.

OPINION.

VAN FOSSAN: We have to consider two fundamental questions, (1) the value of ganister rock property and certain contracts at the date of acquisition in 1911, and on March 1, 1913, and (2) the deductibility and amount of amortization of war facilities. The decision on these issues, coupled with the stipulation of the parties, disposes of all the issues that were presented.

For some years prior to 1911 Davis had been employed by Harbison-Walker Corporation, a pioneer concern in the ganister rock

and silica brick manufacturing industry, and had devoted years to the study of that industry. He represented his company in various capacities and served in important positions. His familiarity with and knowledge of the industry, in all its phases, were recognized by the company and his opinion and advice were relied upon. For reasons not material here, Davis determined to sever his connection with Harbison-Walker and to organize a corporation to engage in the same industry. In furtherance of this plan in 1910 and 1911 he proceeded secretly to acquire options upon numerous small tracts of ganister rock, to negotiate contracts to insure a plant site, transportation facilities for raw materials and fuel requirements, and to obtain the necessary financial backing for his project. On September 12, 1911, all his preliminary plans having been perfected, Davis incorporated the petitioner and transferred to it the ganister lands and the agreements for contracts covering transportation and fuel, for which he received 720 shares of the capital stock.

Although it appears that the legal title to some of these lands was acquired in the name of the petitioner, after incorporation, direct from the original owners, without the intervention of Davis in the chain of title, the evidence is clear that the title to all the lands was acquired through the exercise of options owned by Davis and with funds supplied by Davis personally. Under such circumstances we think it clear that Davis transferred the beneficial ownership of all the property to petitioner and that the petitioner in effect received title to all the property from Davis in exchange for stock. (See *Federal Plate Glass Co.* v. *Commissioner*, 6 B. T. A. 351.)

Davis' plans contemplated a plant with an ultimate capacity of 160,000 brick per day, but in 1912 the policy of the company was based on a plant of 30,000 brick per day, and it was not until the latter part of 1916 that petitioner reached a production of 160,000 bricks.

The ganister lands were acquired by Davis through an agent in small parcels from individual and independent owners, at a total cost not exceeding $30,000. The separate parcels, taken individually, were of comparatively little value, because of the limited quantity of rock recoverable from any one tract. All the parcels, however, being contiguous, when consolidated formed a property 11 miles in length, containing 8,000,000 tons of loose measure rock, recoverable without the necessity of drilling. As one property, these parcels were of much greater value than the sum of the values of the parcels as separate properties. *Adams Express Co.* v. *Ohio State Auditor*, 166 U. S. 219. (Cf. *Appeal of Aguilar Land Association*, 3 B. T. A. 705.) The rock on this property was of excellent quality, from which the best grade silica brick and by-products could be manufactured, and was readily accessible to petitioner's proposed

plant. The manufacture of steel by the open-hearth method was, in 1911, well advanced and was rapidly expanding, and the demand for brick made from ganister rock was increasing in proportion. The heat-resisting qualities of such brick made it highly desirable for use in steel furnaces, both of the old Bessemer type and the new open-hearth type. The development in 1911 of the by-product coke oven process created a further demand for ganister brick. It seems clear from the evidence before us that there was an adequate market available for petitioner's product.

Davis placed a value of 10 cents per ton, or $800,000, upon the rock in place at the date of petitioner's incorporation, basing his value largely on the estimated profits to be made in converting the rock into brick. The Commissioner's value was $80,000. In the opinion of another witness, Mr. Hartman, this rock was worth from $500,000 to $600,000. This figure was predicated on the assumption of a plant of large capacity. Mr. Hartman testified to three sales of ganister rock properties, in tracts much smaller than that acquired by the petitioner, made in Pennsylvania at or about 1911, where, in one instance, a tract containing approximately 150,000 tons of rock sold for $14,000, and in the others, two tracts containing approximately 400,000 tons each sold for $60,000 and $40,000, respectively. These sales were not shown to be sufficiently representative to establish a conclusive measure of value.

Upon consideration of the entire record and giving due weight to all the evidence relative to the quality and quantity of the rock, the size of the property, the facility of recovery, the uses and demand for the product, the accessibility of the property, the existence of an available market, the assurance of a plant of 30,000 brick capacity, with a reasonable expectation of expansion, as well as the evidence of three sales of somewhat similar property, we find that the actual cash value of the ganister rock property and ganister rights paid in to the petitioner by Davis for stock was $300,000 at the time so paid in, 1911. Both petitioner and respondent agree that the value on March 1, 1913, was the same as at the date of acquisition. Accordingly, we find that the March 1, 1913, value of this property was $300,000. This amount should be used in the computation of petitioner's invested capital and also in computing depletion allowances for the taxable years.

The evidence relative to the freight and coal contracts alleged to have been paid in by Davis at the date of incorporation, fails to establish any value therefor. There is some question whether Davis owned any such contracts, for it appears that all he had was the agreement of the railroad and coal companies to enter into such contracts with the petitioner, if and when incorporated. But even if it be conceded that Davis did own such contracts there is no basis in

this record upon which to find any value therefor. It appears that similar contracts upon like terms were made by the coal company with other corporations, competitors of the petitioner, and so far as the record discloses any one desiring such a contract might obtain it upon application to the coal company. The same observation applies to the railroad contract. Nothing was paid for it and it was not shown to be exclusive. Although such contracts may have afforded some security to the petitioner in solving its transportation and fuel problems, and contributed to the successful organization of the company, there is nothing in the record to indicate that they had an independent value. Neither Davis nor the petitioner paid a bonus for these contracts and it nowhere appears that they could be sold for any amount. We hold, therefore, that the freight and coal contracts had no cash value either at the date of acquisition or on March 1, 1913, and they were properly excluded from invested capital. It follows that no deduction is allowable in the taxable years for the exhaustion of such contracts and that no deduction can be allowed in the year 1918 for the alleged loss of the freight contract.

We come now to the last issue—amortization of war facilities. The petitioner claims a deduction from gross income for the amortization " of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war," under the provisions of section 234(a) (8), Revenue Act of 1918. The claim comprises certain dwelling houses constructed by the subsidiary corporation, as well as certain items of plant equipment, as set forth in the findings of fact. The respondent refused to allow a deduction for amortization and contends that the petitioner is not entitled to such an allowance, for the reason that no " claim therefor was made at the time of filing return for the taxable years 1918, 1919, 1920, or 1921 " as provided by section 234(a) (8), Revenue Act of 1921, and no claim therefor was made before June 15, 1924, as provided by section 1209, Revenue Act of 1926.

It is not disputed that petitioner filed with its 1918 and 1919 returns claims for amortization of war facilities, but it appears that the claims so filed do not agree in amount and in certain items with the claim made in this proceeding. It further appears that petitioner by letter of February 28, 1921, tentatively withdrew its claim for amortization of war facilities filed with the 1918 return, " to the end that consideration of the revision of the income tax may be had under sections 327 and 328, otherwise to be reinstated." It does not appear that the claim filed with the 1919 return was ever withdrawn for any purpose, but neither of the original claims embraced the houses constructed by the subsidiary corporation. Upon these facts

the respondent contends that no claim for amortization was made within the time prescribed by the revenue laws.

The Revenue Act of 1918, section 234(a)(8), provided that in the case of facilities—

constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, * * * there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities * * * as has been borne by the taxpayer.

No special method or limitation is prescribed by the 1918 Act for the making or allowance of a claim for such deduction. In section 234(a)(8) of the 1921 Act, however, Congress did incorporate a specific limitation upon amortization claims by providing that the deduction—

shall be allowed, for any taxable year ending before March 3, 1924 (if claim therefor was made at the time of filing return for the taxable year 1918, 1919, 1920, or 1921).

Since it is conceded petitioner made a claim for amortization with its 1918 and 1919 returns, the decision on this point turns on the effect of petitioner's letter of February 28, 1921.

The letter in question is couched in conditional or contingent terms. It was at most a tentative withdrawal. The fact that the claim was subsequently insisted upon and considered by the Bureau indicates that it was so understood by both parties. It was subsequently referred to in various communications and the deficiency letters on which the proceeding is based ruled adversely on its merits.

The tentative withdrawal was much in the nature of an offer in compromise and failing to accomplish the settlement of the tax controversy between the parties, it should not be held binding. We are of the opinion that petitioner's claim for amortization is properly before us for consideration.

Nor is it material that the items of the claim presented before us are not identical with the items contained in taxpayers' statement of claim attached to its returns. Respondent's contention would forbid any amendment of such a claim, either by striking out or adding to the items originally presented. In our opinion such a strict construction would be violative of the purposes of the law. The amortization provision is a relief measure, and should be liberally construed. A reading of the Act convinces us that the clause, " if a claim therefor was made " refers to and modifies the phrase, " reasonable deduction for amortization." The making of the claim at the time of filing the return puts the Government on notice of the existence of the claim. Its duty then is to determine what constitutes a reasonable deduction. It is conceivable that a claim for a reasonable deduction for the amortization of war facilities set up as a lump

sum with no itemization might be held to satisfy the provision that "a claim therefor be made." There is nothing in the Act specifically requiring itemization or forbidding amendment at any time before final settlement. We are satisfied that petitioner, having made claim for a reasonable deduction for amortization at the time of filing its return, may properly be allowed to amend its claim at the time of filing a petition with the Board, and may include items not listed in its original claim.

The petitioner filed a consolidated return for the taxable years, for itself and subsidiary, the Kistler Land & Improvement Co., and its tax liability has been determined upon the basis of consolidated net income. No question is raised as to the affiliation of the two corporations. It follows that for the purpose of the taxing statutes the two corporations are to be treated as one and their separate, independent corporate identities are merged into the new taxable entity thus created. *Appeal of American La Dentelle, Inc.*, 1 B. T. A. 575. All matters affecting the tax liability of either or both members of the group are to be considered in determining the tax liability of the new taxable entity. The amortization deduction, as well as all other deductions to which either or both corporations are entitled, is allowable to the new entity. *Appeal of G. M. Standifer Construction Corporation*, 4 B. T. A. 525. It follows further that a claim for amortization filed by the new entity (or the parent corporation) in accord with the provisions of the Act is a sufficient compliance with the requirement that a claim be filed, to entitle the consolidated group to the amortization deduction allowable to both corporations. We proceed, therefore, to consider the amortization of the houses erected by the subsidiary company.

The houses constructed by the subsidiary corporation, with funds supplied by the petitioner, are facilities constructed or erected for the production of articles contributing to the prosecution of the war, within the meaning of section 234(a)(8) of the Revenue Acts of 1918 and 1921. The petitioner had to supply living quarters for its employees in order to obtain the labor necessary to operate its plant, and the subsidiary corporation was organized merely as a convenient method of providing the necessary housing facilities. See *Appeal of G. M. Standifer Construction Corporation, supra.*

The number of houses, and the cost thereof, constructed by the subsidiary company on or after April 6, 1917, are set forth in the findings of fact. A total of 175 housing units were available and occupied in the year 1918 and the greatest average number of units occupied at any time in the normal postwar years was 90. The value in use of such houses was, therefore, a fraction over 51 per cent and the decline in useful value was approximately 49 per cent,

which we find is a reasonable allowance for the amortization of the cost of the houses.

The expenditures under the contracts on account of these houses were $92,210 and the amortization deduction should be computed on this basis. The expenditures in excess of this figure were not explained and are excluded.

We have set forth in the findings of fact the facilities constructed, erected, installed, or acquired on or after April 6, 1917, for the production of articles contributing to the prosecution of the war, together with the cost thereof. It appears that certain expenditures on account of some of the facilities were made subsequent to November 11, 1918, and in the year 1919, but the evidence is clear that all the equipment was constructed pursuant to a plan of expansion determined upon in 1917 after April 6, and that the expenditures made in 1919 were necessary to the completion of construction theretofore begun, which would have been totally lost unless completed. In this circumstance we believe the expenditures subsequent to December 31, 1918, should be included in the computation of amortization.

Considering the specific items, it appears that the crusher, erected in 1917 at a cost of $7,633.91, was used but little during the war period and at the close of the war was placed upon a siding and scrapped, and that the electric outfit, erected in 1918 at a cost of $28,477.38, was never used by the petitioner and was sold in 1925 for $2,500. Amortization on these two items should be allowed for the full amount of the cost after deducting depreciation incurred, and, in the case of the electric outfit, the salvage value realized upon the resale in 1925. It was not established that the product of the dust mill was an article contributing to the prosecution of the war and no amortization on account of its cost is allowed. The storage sheds have been used to capacity in the postwar years, as well as during the war period, and the petitioner abandoned its claim for amortization of their cost. The remaining facilities of plant equipment have been used to some extent during the postwar years, but the available production has not been sufficient to permit of their use to capacity, nor is it possible to determine the exact percentage of use of each item. As to these latter facilities, therefore, their value in use to the petitioner in the postwar years may properly be measured by comparing the maximum war-time production of the plant with the maximum production in any of the postwar years. The production of the plant in 1917 was 40,590,475 brick, while the maximum production reached in any of the normal postwar years (1923) was 25,754,258 brick. It thus appears that the facilities in question had

a useful value of 63.4 per cent during the postwar period and that the decline in useful value is 36.6 per cent, which we find is reasonable and should be allowed.

It did not appear in the record of the case that petitioner's wartime production continued beyond December 31, 1918, and that date is accordingly fixed as the termination of the amortization period. The deduction for amortization will be confined to the 1918 income. *Appeal of John Polachek*, 3 B. T. A. 1051.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by MARQUETTE and PHILLIPS.