(No. 35055.—

Chicago, Burlington & Quincy Railroad Company, Appellee, vs. The Department of Revenue, Appellant.

*Opinion filed September 24, 1959—Rehearing denied Nov. 16, 1959.*

LATHAM CASTLE, Attorney General, of Springfield, (WILLIAM C. WINES and RAYMOND S. SARNOW, Assistant Attorneys General, and JOHN E. BABB and JOHN L. ROACH, Special Assistant Attorneys General, of counsel,) for appellant.

DIXON, DEVINE & RAY, of Dixon, C. W. KROHL, R. T. CUBBAGE, J. R. WOLFE, and J. I. SHIELDS, all of Chicago, (ELDON MARTIN, of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The Chicago, Burlington & Quincy Railroad Company brought this action in the circuit court of Lee County to review the 1957 assessment of its Illinois property by the Department of Revenue. It claimed that the assessment at $147,000,000 was excessive by $72,000,000. The circuit court set aside the assessment "at least to the extent" that

it exceeded the 1956 assessment of $144,600,000. The Department appealed directly, (Ill. Rev. Stat. 1955, chap. 120, par. 619,) and the plaintiff cross-appealed.

Under the Revenue Act of 1939 it is the duty of the Department to assess the system value of the operating property of railroads doing business in this State, to determine the value of the Illinois portion of such property, and to certify to each taxing district in which operating property of the railroad is located its appropriate portion of the statewide value. (Ill. Rev. Stat. 1955, chap. 120, pars. 560-571.) The tax rates of the local taxing bodies are then applied to the assessed values so certified. Non-operating property in Illinois is locally assessed.

Plaintiff is an interstate railroad operating in 12 States. In determining the 1957 assessed value of its Illinois operating property, the Department took into account: (1) the capitalized value of the average of net system railway operating income for the past five years; (2) the market value of stock and debt, using a five-year average; (3) the cost of reproduction less depreciation of physical property located in Illinois. An allocation fraction was then applied to the first two items to determine the portion of the total system value represented by Illinois assets, and a judgment factor was used which substantially reduced the average of the three items. This method of valuing railroad operating property is used in assessing all railroads in Illinois, and it complies with the statutory requirements. *Chicago and North Western Railway Co.* v. *Department of Revenue,* 6 Ill.2d 278.

This method produced the following results: (1) capitalized earnings value allocated to Illinois, $151,728,000; (2) stock and debt value allocated to Illinois, $135,519,000; (3) reproduction cost, less depreciation, of Illinois property, $298,303,000. The average of these three amounts is $195,183,000. The assessment as finally determined by the Department was $147,000,000.

Mere differences of opinion, however pronounced, do not warrant judicial impeachment of a valuation determined by the Department of Revenue. (*St. Louis Bridge and Tunnel Railroad Co.* v. *People ex rel. Baker,* 127 Ill. 627.) An entire railway system is seldom bought and sold and any process of determining its fair cash value must necessarily depend more on informed judgment than on hard and fast rules. "Facts of great variety and number, estimates that are exact and those that are approximations, forecasts based on probabilities and contingencies have bearing and properly may be taken into account to guide judgment in determining what is the money equivalent—the actual value—of the property." (*Rowley* v. *Chicago & Northwestern Railway Co.* 293 U.S. 102, 109, 79 L. ed. 222.) The plaintiff contends that its property was so grossly overvalued by deliberate miscalculations and the selection of improper factors designed to inflate value as to constitute constructive fraud. Such an allegation, if proved, merits judicial relief. (*Chicago and North Western Railway Co.* v. *Department of Revenue,* 6 Ill.2d 278.) A detailed review of the procedure followed by the Department in valuing the plaintiff's property is therefore necessary.

The first test of value to be examined is the determination of the capitalized net railway operating income of the plaintiff. The data used by the Department was supplied by the plaintiff in the return required of all railroads by section 82 of the Revenue Act. (Ill. Rev. Stat. 1955, chap. 120, par. 563.) Plaintiff's net operating income for the years 1952 through 1956 as reported to the Interstate Commerce Commission ranged from $31,744,000 in 1952 to $25,542,000 in 1956. The five-year average was $28,-281,000. This amount was capitalized at a rate of 6% to arrive at a system valuation of $471,350,000. Application of an allocation fraction of 31.19% resulted in a determination by the Department that a value of $151,728,000 on

the plaintiff's operating property in Illinois was indicated by the capitalized earnings method of valuation.

The plaintiff contends that this valuation is excessive and that the proper Illinois value indicated by its capitalized net operating income is $60,842,000. Each step of the Department's determination is attacked: it is suggested instead that an income figure of $17,394,000 should have been capitalized at 8% for a system value of $217,425,000 and an allocation factor of 27.98% then applied.

In computing net railway operating income, the Department allows a deduction to be taken for amounts that are accrued for Federal income taxes. This deduction is the source of most of the disagreement between the plaintiff and the Department over the amount of income to be capitalized. The plaintiff complains that the tax return form furnished by the Department for its use is inadequate to record properly the Federal tax deduction to which it is entitled. As an example of this inadequacy, plaintiff points to its reported Federal tax accruals of $20,000,000 for 1956. It is contended that this figure, which is an estimate of its Federal income tax liability as a corporate entity, included tax deductions produced by non-operating property. These tax deductions allegedly decreased by $3,658,000 the tax accruals reported in 1956, and thereby caused an overstatement of net railway operating income. However, the plaintiff admits that its corporate Federal tax accruals for 1956 also took into account income of $1,146,000 derived from non-operating property which tended to understate its net railway operating income. Such evidence does not bolster the plaintiff's charge of gross miscalculations indicative of constructive fraud. Moreover, it appears that the Department does not agree with the plaintiff that the items in question are properly classified as non-operating, and plaintiff's briefs do not shed any light on that basic controversy.

A much more important dispute arising from the Federal tax accrual item concerns the rate of depreciation to be allowed in determining net income. For Federal income tax purposes the plaintiff used an accelerated rate of depreciation on certain operating property, a practice authorized with respect to new facilities deemed essential to national defense. The Department, in accordance with the practice followed by the Interstate Commerce Commission, limits depreciation accounting to a straight-line method reflecting normal service life. The plaintiff contends that a requirement that it use a long-term rate of depreciation in valuing its property when it is using a short-term rate to take deductions from the Federal income tax results in a deflation of Federal tax accruals and an overstatement of net operating income. We do not think this contention merits serious attention. A straight-line method of depreciation may be used for income tax purposes if the taxpayer desires, and the plaintiff can continue to depreciate its property in its reports to the Department even after the cost had been amortized in Federal income tax deductions. The allegation that inaccuracies in plaintiff's reported operating income caused by different accounting methods may not level off in the future because of changing Federal tax rates need not be explored. Such a result would be due to the manner in which the plaintiff has chosen to report its income to the Federal government rather than to deliberate miscalculations of the Illinois Department of Revenue.

The plaintiff's objection to the Department's use of a 6% rate in capitalizing its net railway operating income is more troublesome. In defense of this rate the Department's railroad assessor testified that "for 26 years I have used 6 per cent as the rate of capitalization for all railroads in the State of Illinois which have income to capitalize. It may not be correct. On the other hand, it has at least been uniformly applied to all railroads during periods of depression and periods of inflation. * * * It is a capitali-

zation figure which most or a great many—not most—but a great many people, I believe, like to consider as a fair return on the property, whether it is or it is not, is another question." We are troubled by the inadequacy of this explanation. The capitalized earnings method of valuation translates expected income into the market value of the income-producing property by estimating the rate of interest a purchaser of an annuity equal to the expected income would demand on his investment. The reliability of this method as a measure of value is therefore keyed to the rate at which expected income is capitalized. *Cf.* Bonbright, Valuation of Property, 1st ed., vol. I, p. 259.

The plaintiff contends that its operating income should be capitalized at a rate of 8%, which would reduce its capitalized net income value by 25%. To support this contention the plaintiff presented evidence at the formal hearing before the Department which tended to show: (1) that the yield on relatively riskless investments such as U.S. Treasury three-month notes and high grade corporate bonds had increased substantially in 1957; (2) that the average rate of capitalization on the earnings of 57 manufacturing corporations listed on the New York Stock Exchange in 1956 should be 7.67%; (3) that the average rate of capitalization on the earnings of 12 railroads, including the plaintiff, for the years 1952 through 1956 should be 8.03%; (4) that the Department uses a 7% rate of capitalization in its assessed valuations of domestic corporations subject to the capital stock tax.

The Department rejected the suggested rate in favor of its traditional rate of 6% which is uniformly applied to the earnings of all railroads. But uniformity of application does not ensure compliance with the statutory mandate that the Department shall determine "the fair cash value" of the property which is assessed. (Ill. Rev. Stat. 1955, chap. 120, par. 561.) The valuations of the Department are entitled to great weight and can only be upset by clear and convinc-

ing evidence on the part of the taxpayer that they were constructively fraudulent. (*People ex rel. Schlaeger* v. *Allyn,* 393 Ill. 154.) This burden becomes insurmountable when, as here, the basis for its findings are not subject to evaluation. We can not determine the proper rate of capitalization. The proceedings must be remanded to the Department for that determination. If capitalized earnings are to have relevance as an indicia of value, a "judgment" reduction in the final assessment is no answer.

The plaintiff also objects to the allocation fraction applied by the Department on the ground that it imports into this State values that do not belong here. The Department concluded that 32.19% of the plaintiff's system value was properly attributable to Illinois operating property by averaging a total of five factors in which the relationship of its Illinois operations to those in 11 other States was considered: (1) car and locomotive mileage (28.60%); (2) traffic units, a combination of freight ton-miles and passenger miles hauled (30.04%); (3) gross operating earnings (30.03%); (4) reproduction cost less depreciation (28.61%); (5) weighted freight tonnage originating, terminating or interchanged to another carrier (43.68%). The plaintiff contends that two additional factors should have been averaged into the allocation fraction used: all track lines (24.48%) and net earnings (12.02%). These additions would have lowered the allocation fraction to 27.98%.

The plaintiff characterizes the Department's exclusion of these factors as "arbitrary." We can not agree. Illinois is the plaintiff's eastern terminal and the largest industrial center in which it operates is located here. The advantage which Illinois property imparts to its system value need not be overlooked. The Revenue Act authorizes the Department to use such allocation factors "as may appear reasonable and necessary in determining for any railroad the proportion of its operating property or any part thereof within this State." (Ill. Rev. Stat. 1955, chap. 120, par. 565.)

Valuable terminal facilities in Illinois are reflected in the weighted freight tonnage factor used; their significance would be neutralized, as plaintiff freely admits, if the suggested factors stressing State-by-State line-haul operations were included.

There may well be additional reasons why the Department did not expand the scope of its allocation fraction as suggested. Total track mileage is accounted for in at least three of the five factors used while a determination of a net earnings factor would require a complicated preliminary allocation process. (*Cf.* Huston, Allocation of Corporate Net Income for Purposes of Taxation, 26 Ill. L. Rev. 725.) The plaintiff complained at the hearing before the Department that the tendency of some "bridging" States to underplay the significance of terminal activity has resulted in an estimated total apportionment of 104.81% of its assessed system value in 1957. Although we recognize the plaintiff's predicament as one of the vexing problems of multistate operation, we can not impose the burden of resolution on the State of Illinois alone. (*Cf.* dissent of Justice Frankfurter in *Braniff Airways, Inc.,* v. *Nebraska State Board of Equalization and Assessment,* 347 U.S. 590, 603, 98 L. ed. 967; Lynn, Formula Apportionment of Corporate Income for State Tax Purposes, 18 Ohio St. L. Jour. 84.) We do not find the allocation rate used by the Department unreasonable.

The second indication of value drawn upon by the Department was the value of plaintiff's stock and debt. In appraisal theory, the worth of a corporate enterprise tends to equal the total of its outstanding stock and debt. (Cf. Bonbright, Valuation of Property, 1st ed. vol. I, pp. 244-49.) Debt is included because its claim on the assets of the corporation is prior to that of equity interests, a fact which will presumably be taken into account by investors in its stock. This method of valuation, like that of capitalized earnings, has its deficiencies. (*Chicago and North*

*Western Railway Co.* v. *Department of Revenue,* 6 Ill.2d 278, 288; *Northern Pacific Railway Co.* v. *Adams County,* (Dist. Wash.) 1 F. Supp. 163.) But its objectivity and the relative simplicity of its application urge its use.

For the most part, data supplied by the plaintiff was relied upon by the Department in valuing its stock and debt. A market value of $138 per share was placed on 1,708,351 shares of stock for a total of $235,642,000. To this amount were added funded debt of $141,412,000, equipment obligations of $65,258,000 and current liabilities of $43,651,000. A deduction of $66,966,000 for non-operating property resulted in a system valuation of $420,997;000. The allocation fraction of 32.19% produced a value of $135,519,000 for Illinois operating property. These calculations by the Department are averages derived from quotations for the years 1952 through 1956 as suggested by the statute. (Ill. Rev. Stat. 1955, chap. 120, par. 561.) In its cross appeal the plaintiff objects to the Department's choice of a per share valuation of $138 on its stock and the inclusion of current liabilities as a measure of value. Its objection to the allocation fraction has been disposed of.

In its tax return the plaintiff estimated the market value of its stock at $100 a share. This estimate was rejected by the Department on evidence that the plaintiff's stock has regularly sold on the open market at a higher price in the past five years: 1952—$121.50; 1953—$125.33; 1954—$134.10; 1955—$151.60; 1956—$157.13. These quotations were confirmed by plaintiff's expert witness, Howard T. Morton, an investment banker specializing in railroad securities. But this witness was of the opinion that these sales do not accurately portray the market value of the plaintiff's stock. The stock is not listed on any stock exchange and, of the 1,708,351 shares outstanding, all but 40,000 are owned by the Great Northern and the Northern Pacific railroads. Based on his observation that more actively traded stocks of comparable railroads sell at less

than 8 times earnings, the plaintiff's expert concluded that recent transfers, of approximately 3,000 shares annually, were over-priced.

We do not understand the plaintiff to contend that this method of appraisal should be excluded or given less weight in this case because its stock is closely held. It is undoubtedly true that isolated over-the-counter sales of a security present an uncertain picture of its market value. But infrequency of trading does not compel a conclusion that a stock is over-priced. One of the plaintiff's witnesses observed that unlisted stock "can only be sold by a purchaser presumably at a great sacrifice if he needed to realize cash from his investment rapidly." The record does not sustain plaintiff's attack upon the valuation of its stock by the Department.

A similar difference of opinion results from the Department's consideration of current liabilities in computing the amount of the plaintiff's outstanding stock and debt. A sum of $43,651,000 was added to the total because of current liabilities such as accrued unmatured interest and taxes, audited accounts and wages payable and traffic and car service balances payable. This figure is an average taken from quarterly balance sheets over a five-year period as reported to the Department by the plaintiff.

The plaintiff contends that the Department's inclusion of current liabilities as evidence of value is arbitrary and unreasonable. From exhibits presented at the hearing before the Department it appears that the significance attributed to the current liabilities of an enterprise by those trading in its stock and bonds is vigorously disputed between the National Association of Tax Administrators and the National Committee of Railroad and Public Utility Tax Representatives. The assumptions made on this point in both presentations do not tend to settle the dispute with finality. We are not disposed to hold from the plaintiff's evidence that it is unreasonable to consider that current liabilities for

current purposes, however temporary, represent debt and a claim upon the assets of a business until satisfied.. (*Cf.* Bonbright, Valuation of Property, 1st ed., vol. I, pp. 246-47.) Normally the judgment of the Department of Revenue should prevail in such a case. The Revenue Act directs the Department in valuing railroad property to consider the value of outstanding stock and bonds "and all other indebtedness as shall be applicable for operating the road, * * *." (Ill. Rev. Stat. 1955, chap. 120, par. 561.) Under the statute the weight to be given such evidence is to be determined by the Department of Revenue. Nothing said in the *State Railroad Tax Cases,* 92 U.S. 575, 23 L. ed. 663, relied on by the plaintiff, requires a different interpretation of these provisions.

However, the plaintiff calls attention to the fact that the Department does exclude current liabilities in measuring the fair cash value of business and utility companies for capital stock assessments under the Revenue Act. (Ill. Rev. Stat. 1955, chap. 120, pars. 498, 502.) The only explanation given for this inconsistency is that different classes of property are involved. This begs the question as to whether current liabilities are relevant to a fair evaluation of the worth of a corporate enterprise. If the Department's judgment on the question is to be determinative, this discrepancy between its railroad and capital stock assessments must be more adequately explained.

The third indicia of value used by the Department is the estimated reproduction cost of its physical property in Illinois with allowance for depreciation. The data relied upon by the Department was supplied by the plaintiff using accounting procedures required by the Interstate Commerce Commission which since 1913 has been charged with the duty of compiling railroad cost information and keeping it up to date with "period" and "spot" price indices. (Valuation Act of March, 1913, 37 Stat. 701, 49 USCA 19a(b).) Based on 1956 period prices, the plaintiff reported a repro-

duction cost of $494,875,000, and a reproduction cost depreciated of $325,554,000. The Department reduced the latter figure by $27,251,000 because of certain uneconomic branch lines and unprofitable public improvements. The balance of $298,303,000 was taken as the cost of reproduction less depreciation and totaled with the value of capitalized earnings and stock and debt for a three-factor average valuation of $195,183,000.

The plaintiff does not contest the accuracy of the reproduction cost figures but argues that this evidence is irrelevant to a determination of its fair cash value because insufficient consideration is given to economic obsolescence undergone by railroad property. Much of the argument made here was rejected in *Chicago and North Western Railway Co.* v. *Department of Revenue,* 6 Ill.2d 278, which upheld the Department's use of the reproduction cost factor in railroad tax assessment cases. The objection made in each case is that a major portion of railroad operating property would not be reproduced today because increasing competition from other modes of transportation in the past 30 years has rendered it unprofitable. The purpose of assessment, however, is to measure the value of existing property. The plaintiff is an operating railroad and the property in question is presently in use. Under such circumstances cost of replacement is normally regarded as relevant.

Increased competition, higher operating costs and technological changes in recent years undoubtedly have diminished the present-day value of railroad operating property. But we think that prolonged adverse business conditions will have been reflected in earnings and the market price of securities, two of the factors used by the Department in its assessed valuation of the plaintiff's propery. In addition, the Department indicated that "adverse business trends and worsened business conditions, higher wages, truck, barge and airline competition were taken into considera-

tion" in its judgment reduction of over $48,000,000 of its formula valuation. We are not disposed to hold that the Department must, as the plaintiff argues, disregard the value indicated by reproduction cost depreciated.

The plaintiff's final contention is that once the Department has determined the "fair cash value" of its operating property it must then equalize its assessed valuation so that the valuation certified to the local taxing units will be uniform with locally assessed valuations, as equalized by the Department. Underlying this contention is the allegation that the Department does not equalize local assessments to full value as the Revenue Act requires it to do each year. (Ill. Rev. Stat. 1955, chap. 120, par. 627.) To support this allegation the plaintiff presented evidence at the hearing before the Department to the effect that the equalized assessed value of real estate in Illinois in 1955 was approximately 50% of its full, fair cash value. If this charge can be substantiated, as to 1957 assessments, the plaintiff's operating property is bearing a disproportionate share of of its tax burden in violation of the constitutional requirement of uniformity. Art IX, sec. 1, Const. of 1870; *People ex rel. Callahan* v. *Gulf, Mobile and Ohio Railroad Co.* 8 Ill.2d 66; *Mobile and Ohio Railroad Co.* v. *Tax Commission,* 374 Ill. 75.

What the court referred to as the "recognized custom" of the State Board of Equalization and the Tax Commission in prior years, to debase or equalize assessed valuations of railroad operating property below full value in order to achieve uniformity with local assessments, is no longer permissible under the Revenue Act. Compare Ill. Rev. Stat. 1937, chap. 120, par. 56.8, in effect when *Mobile and Ohio Railroad Co.* v. *Tax Commission,* 374 Ill. 75, was written, with Ill. Rev. Stat. 1955, chap. 120, par. 567. With the enactment of the Butler amendments to the Revenue Act in 1945, the General Assembly required that all valuations upon which tax rates are extended must be at full, fair cash

value. It is the duty of the Department of Revenue to carry out the statutory mandate. Assessments made by the Department must be at full value, (Ill. Rev. Stat. 1955, chap. 120, pars. 502, 561) and local assessments must be equalized by the Department to full value by increasing or reducing the aggregate assessed valuations made in the several counties. Ill. Rev. Stat. 1955, pars. 627, 630.

The Department, however, refused to consider the plaintiff's evidence on the ground that the hearing requested by the plaintiff was concerned with the Department's duty to assess the value of railroad operating property and not with its duty to equalize local assessments throughout the State to full value. We think the Department was correct. It has no authority to reduce its assessed valuation of the plaintiff's property to less than full value. And the time sequence prescribed by the Revenue Act for local assessment of property makes it unlikely that the various county equalization factors will have been determined at the time that the Department is valuing railroad property. (Cf. Ill. Rev. Stat. 1955, chap. 120, pars. 581, 588, 591, 592, 609, 627, 629a; *People ex rel. Tennyson* v. *Texas Co.* 406 Ill. 120.) But appropriate remedies are available if the plaintiff's property is in fact bearing a disproportionate share of the tax burden in some taxing districts. Plaintiff may petition the Department for a reconsideration of the equalization multiplier certified to a county clerk for application to local assessments. (Ill. Rev. Stat. 1955, chap. 120, par. 629a.) And such an objection may also be raised to a county collector's application for judgment and order of sale of its real estate. *People ex rel. Callahan* v. *Gulf, Mobile and Ohio Railroad Co.* 8 Ill.2d 66.

The judgment of the circuit court is affirmed in so far as it remands the cause to the Department of Revenue, and the Department is directed to proceed in accordance with this opinion.

*Affirmed and remanded.*