**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellant,**

v.

**STATE TAX COMMISSION of Missouri, Hunter Phillips, Chairman, Carl E. Davis and J. Ralph Hutchison, Members, J. R. Towson, Secretary of the State Tax Commission, Respondents.**

**No. 53500.**

Supreme Court of Missouri, Division No. 1.

Sept. 9, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 14, 1968.

Certiorari Denied Feb. 24, 1969.
See 89 S.Ct. 878.

Richard T. Cubbage, Chicago, Ill., John C. Street, Denver, Colo., Forrest P. Carson, Jefferson City, Clyde J. Linde, Kansas City, for appellant, Linde, Thomson, Van-Dyke, Fairchild & Langworthy, Kansas City, of counsel.

Norman H. Anderson, Atty. Gen., Walter W. Nowotny, Jr., Asst. Atty. Gen., Jefferson City, for respondents.

HIGGINS, Commissioner.

Proceeding under Section 536.100 et seq., V.A.M.S., for judicial review of a final decision of the State Tax Commission of Missouri. The circuit court affirmed the decision, and the railroad's appeal involves construction of the revenue laws of the state.

On June 23, 1966, the State Tax Commission of Missouri assessed the distributable property in Missouri of the Chicago, Burlington & Quincy Railroad Company for 1966 at $33,429,871. C. B. & Q. sought a review of that decision alleging, among other things, that the Commission had denied the railroad a hearing at which to present its theory of assessment. The circuit court remanded the case to the Commission with directions that C. B. & Q. be granted a hearing.

C. B. & Q. filed Commission Form No. 1, "Statement of Taxable Property owned by the C. B. & Q. Railroad Company on the first day of January, 1966, required to be made to the State Tax Commission, as provided in Section 151.020, R.S.Mo., 1959." Section 151.020, V.A.M.S., requires the statement to be made under oath and to contain "in detail the total length of * * road * * * including branch or leased roads, the entire length in this state, and the length of double or sidetracks, with depots, water tanks and turntables, the length of such road, double or sidetracks, in each county [and other specified tax districts] * * *; the total number of engines and cars of every kind and description * * * and all other moveable property owned, used or leased * * *, and the actual cash value thereof."

At the hearing C. B. & Q. presented its theory of assessment of the property returned on Form No. 1 through witnesses Broley E. Travis, a consulting valuation engineer and former valuation engineer in the Valuation Department of the Public Utilities Commission of the State of California, and James P. Reedy, general tax

agent for C. B. & Q. Their testimony and the railroad's theory are summarized in this reproduction of C. B. & Q. Exhibit T:

## CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY

1966 Missouri Tax Value Based on Use of Three Factor Formula:
(I) Capitalized Earnings, (II) Market Value of Stock & Debt
and (III) Depreciated Investment in Road and Equipment

| | | (000) | System (000) | Missouri * (000) |
|---|---|---|---|---|
| I | Net Railway Operating Income: as reported to I.C.C. (5-year average—1961–1965) | $ 22,553 | | |
| | Capitalized at 7% | | $322,186 | $ 48,392 |
| II | Stock & Debt Value: (5-year average—1961–1965) | | | |
| | Stock at Market Value ($152.61) | $260,718 | | |
| | Mtge. & Equipment Trust Debt | 223.372 | | |
| | Total | $484,090 | | |
| | Less Value of Non-Oper. Prop. | 141,484 | $342,606 | $ 51,459 |
| III | Depreciated Investment in Transportation Property 12/31/65: | | $714,821 | $107,366 |
| | Total I, II and III | | | $207,217 |
| IV | Average Above 3 Factors | | | $ 69,072 |
| V | Full Value Equalized at 30% | | | $20,722 |

\* Allocation to Missouri is on Road Miles Operated Basis—15.02%.

———◆———

Mr. Travis and Mr. Reedy were of the opinion that the theory presented by Exhibit T was the best method of valuing a railroad for tax purposes, and Mr. Reedy stated the request for a hearing before the Commission was to show the Commission indicators of value other than those employed by the Commission; however, Mr. John Street, of counsel for C. B. & Q. at the hearing, stated that the railroad did "not contend that you (members of the Commission) are required to use it."

C. B. & Q. also presented J. Edward Connell, former supervisor of ad valorem taxes with the State Tax Commission of Missouri to establish the equalization factor of 30 percent.

The Commission's assessment of the property returned on Form No. 1 rejected the method suggested by C. B. & Q. and the method used was explained through the testimony of Carl A. Norfleet, supervisor of taxes for the Commission. He made the Commission's computations and stated that in assessing railroads and utilities market value is rarely known because there were rarely any sales of railroads between a willing buyer and a willing seller. Therefore, any assessment is an estimate under any method and no valuation will be scientifically exact. The Commission employs a method to meet requirements that an assessment be reasonable and nondiscriminatory.

As with all railroads operating in Missouri, he (and the Commission) used a method under which a value per mile was placed upon each type of C. B. & Q. track reported by C. B. & Q. in Missouri; a value per acre was placed upon the

number of acres of C. B. & Q. right of way reported to be in Missouri; a value was placed upon the C. B. & Q. buildings and other fixed propery reported by C. B. & Q. in Missouri; a value was placed upon the rolling stock of C. B. & Q., Missouri's portion being ascertained by calculating the ratio (15.02%) between the number of miles of first main line and branch line track used by C. B. & Q. in Missouri and these items in the entire system. The aggregate value thus determined was reduced by an economic obsolescence factor. The acreage value, $60 per acre, was the same as employed in 1964 and 1965 assessments. The railroad's report of buildings and other fixed property was returned by C. B. & Q. at $384,859. This was adjusted to $399,913 and "trended upward" by the Commission by a factor of 226.566, resulting in a value of $906,067. The factor is used to bring reported values up to current reproduction cost and to offset low values reported in Form No. 1.[1]

Main line value was first set at $22,625 per mile but reduced to $20,000 per mile at the request of Mr. Reedy. Valuation of other types of track was made using values per mile employed in previous years.

Rolling stock reported by C. B. & Q., according to units, type, age, and original cost, was depreciated 5% per year until a base of 25% of original cost was reached, not to be reduced further so long as the unit remains in service. The depreciated cost was then equalized by a factor of 47%, i. e., 47% of 25% of original cost after 15 years, an ultimate valuation of 11.75% of original cost of such units.

The depreciated original cost of C. B. & Q. rolling stock, including leased rolling stock, was found at $205,649,935, and equalized at 47%, resulting in an equalized value of $96,665,469 for taxation on rolling stock. Application of the 15.021% ratio factor resulted in Missouri's allocated portion of rolling stock at $14,518,618 to which was added $8,337 for leased cars, an ultimate value of $14,526,955. Addition of $19,350,233, value of roadbed, fixed property, $906,067, rolling stock, $14,526,955, less economic obsolescence, $1,353,384, resulted in an aggregate assessment of all distributable property of C. B. & Q. for 1966 of $33,429,875.

The economic obsolescence factor was calculated from a consideration of the railroad's total investment in transportation property compared to net railway operating income for 1965, as reported by C. B. & Q. on Form No. 1 in 1966. This calculation found net operating income at $20,-423,802, subtracted the resulting percentage, 1.99%, from a desired income yield of 10%, which developed a factor of 8.01% for economic obsolescence. Mr. Norfleet stated that employment of the 47% equalization factor reduced the value of rolling stock to the level of 30% of value which the Commission tries to achieve in assessments. He stated also that the formula used for the entire assessment brought C. B. & Q., and railroad property generally, to the desired 30% level of value. Also in the opinion of Mr. Norfleet the assessment theory of C. B. & Q., based on stock and debt, should be rejected because C. B. & Q. is closely held by two other railroads and because only some 2,000 of 1,708,391 shares of stock had been traded in the previous year and these were not open market transactions.

In addition to the $33,429,871 total assessment first calculated by the Commission from Form No. 1 as filed by C. B. & Q., the Commission developed unreported properties and additional values at the hearing. Through testimony of L. Glenn Key, general land agent for C. B. & Q.,

---

1. E. G., in testifying relative a particular depot building Witness Reedy of C. B. & Q. stated: "Where the building freight depot was built in 1961 at an original cost of $666,397, the depreciated cost was $664,021. I returned $95,000 as the value of that freight depot knowing that there would be a $223,000 assessment placed upon it utilizing the historical 226 point multiplier."

the Commission adduced evidence that C. B. & Q. had, in recent years, sold certain tracts of locally assessed real estate which it owned adjacent to its right of way in North Kansas City and in St. Louis, Missouri; that these tracts had sold for an average price in excess of $10,000 per acre and that, through use of these sales as comparisons, 224.47 acres of right of way, located on similar land in the C. B. & Q. yards in North Kansas City and 107.67 acres in the St. Louis yards should be valued at an additional $3,080 per acre based on a 30% level assessment, an addition of $677,899. Unreported distributable property used in the railroad's "piggyback" operation was assessed at an additional $731,791. Similarly twelve unreported diesel locomotives were assessed at $197,-774. After application of the economic obsolescence factor, a total additional valuation of $1,777,824 was added to the previous assessment of $33,429,871. This resulted in the final assessment for 1966 of $35,207,695 affirmed by the circuit court on review.

Appellant contends: Points I and II, that it was not given a fair, unbiased and impartial hearing, and was denied due process by exclusion of testimony and exhibits; Points III, IV, and VII, that the assessment did not follow legal principles and was made without authority, contrary to Chapter 151, RSMo., is not supported by competent evidence, and results from arbitrary, capricious and unreasonable conduct on the part of the Commission; Points V and VI, that the assessment is invalid because the Commission failed to receive and consider evidence relating to appellant's method of valuation of railroad property and concerning actual cash value of its property; and, Point VIII, that the assessment discriminates against appellant.

Pursuant to Article 10, Section 5, Constitution of Missouri, V.A.M.S., Chapter 151, V.A.M.S., provides for ad valorem taxation of railroad companies.

Section 151.010 provides that all railroads and all real property, tangible and intangible personal property, owned, hired, or leased in Missouri, shall be subject to taxation, "and taxes levied on real property, and tangible personal property, shall be levied in the manner herein set forth, and the taxes on intangible property shall be levied and collected in the manner otherwise provided by law."

The provisions of Section 151.020 concerning the railroad's report of its distributable property to the State Tax Commission already have been stated.

Section 151.060 provides that the Commission "shall assess, adjust and equalize the aggregate valuation of the property" of each railroad in the state; shall have power to summon witnesses; and "shall have the power, upon their knowledge, or such information as they can obtain, to increase or reduce the aggregate valuation of the property of any railroad company included in the statements and returns made by the railroad companies * * *, and shall assess, adjust and equalize any other tangible property belonging to said railroad companies, * * * upon which no returns have been made, which may be otherwise known to them, as they deem just and right." The Commission "may arrive at its finding, conclusion and judgment, upon its knowledge, or such information as may be before it, and shall not be governed in its findings, conclusions and judgment by the testimony which may be adduced, further than to give to it such weight as the commission may think it is entitled to; provided, that when any railroad shall extend beyond the limits of this state and into another state in which a tax is levied and paid on the rolling stock of such road, then the said commission shall assess, equalize and adjust only such proportion of the total value of all the rolling stock of such railroad company as the number of miles of such road in this state bears to the total length of the road as owned or controlled by such company."

Section 151.090 provides that the Commission shall certify its action (assessment) to the railroad company. "The

certificate shall set forth the entire length of the railroad, including sidetracks, in the state, and the valuation thereof per mile; the total value of the rolling stock of the railroad; the total length of the roadbed, including sidetracks, in each county [and other specified tax districts] * *; also the total value of roadbed and sidetracks and rolling stock as assessed, adjusted, equalized, and apportioned to such county, etc. * * *."

Section 151.100 provides that real property, or tangible personal property, including lands, buildings, goods, chattels and office furniture of the railroad shall be assessed by the proper assessor.

▆▆▆ In respect to appellant's Points I and II, there is no question that the Commission as an administrative agency owed C. B. & Q. a fair hearing, National Labor Relations Board v. A. Sartorious & Co., 2 Cir., 140 F.2d 203, 205 [2], Local No. 3, etc. v. N.L.R.B., 8 Cir., 210 F.2d 325, 329–330, Jones v. State Dept. of Public Health and Welfare, Mo.App., 354 S.W.2d 37, 39–40 [2–6], 41 [10], and due process, Donnelly Garment Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 215, 224 [12–14], Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 68 L.Ed. 667. Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288. However, the statements which those cases provoked are not applicable here because the record and the Commission's findings do not demonstrate a studied rejection of or hostility to one side of the case before the Commission. It is true that the Commission gave greater and prevailing weight to the evidence of its own witnesses, but this is in accord with statutory authority. It is true also that the record and findings show that some of the testimony and exhibits offered by C. B. & Q. were received over Commission objection "for what it (or they) might be worth," but this, too, is consistent with the authority given the Commission. The Commission's findings demonstrate a detailed recital and examination of the testimony of the railroad's witnesses and exhibits, and upon such examination that evidence was found to lack the credibility attached to the Commission's own presentation in arriving at the assessment. Appellant's charges of refusal to consider its case and protestations of unfair treatment are refuted by this record of nearly 900 pages and the Commission's findings of fact of nearly 62 pages which provide graphic attestation to ample opportunity for C. B. & Q. to present its theory to the Commission and full consideration of that theory by the Commission. The hearing procedure was thus in accord with the provisions of Section 151.060, supra, and appellant's citations. "The Commission could disbelieve plaintiff's evidence of value even without other evidence * * *, although it may not * * * act upon whim and without reason," May Department Stores Co. v. State Tax Commission, Mo., 308 S.W.2d 748, 761 [16]; and the Commission's findings make plain why it did not consider the railroad's witnesses and exhibits credible in the circumstances presented by this case. Cupples-Hesse Corp. v. State Tax Commission, Mo., 329 S.W.2d 696, 701 [12]; State ex rel. Kahler v. State Tax Commission, Mo., 393 S.W.2d 460, 465 [7].

Appellant's contention under Points III, IV, and VII, is that the Commission's assessment method does not follow Section 151.060, supra, to achieve "aggregate valuation," because it values separate parts of the railroad; that it does not comport with Section 151.020, supra, requiring a railroad to report its distributable property at "actual cash value," and therefore fails to meet the requirement of construing taxing statutes in favor of the taxpayer. See Green Fire Brick Co. v. State Tax Commission, Mo., 277 S.W.2d 544, 545; United Air Lines, Inc. v. State Tax Commission, Mo., 377 S.W.2d 444, 448; Union Electric Co. v. Morris, 359 Mo. 564, 222 S.W.2d 767, 770; State ex rel. Halferty v. K. C. Power & Light Co., 346 Mo. 1069, 145 S.W.2d 116, 121; State ex rel. Moore v. Wabash R. Co., Mo., 208 S.W.2d 223, 226. The argument is that the Com-

mission failed to heed these citations in rejecting the railroad's theory of assessment and employed a theory of assessment not supported by the evidence.

It has already been demonstrated that the railroad's theory of asssessment was received, fairly considered, and rejected upon credibility findings, leaving for determination whether the Commission's method followed the statute, was reasonable, and supported by evidence.

■ The theory of the Commission and the evidence in support of that theory have already been stated in detail in a review of the testimony of Mr. Norfleet. Again, despite protestation to the contrary, the steps followed in the method employed by the Commission show that the Commission did arrive at an aggregate valuation of the railroad's property as a unit in that valuation of the aggregate necessarily cannot be broken into divisible parts as by county lines, but is necessarily a valuation of the total of the railroad's component parts,[2] i. e., a unit composed of "tracks, depots, water tanks, turntables, rolling stock, etc., known in common parlance and denominated in this statute [now Section 151.060] as a railroad." State ex rel. Murphy v. Stone, 119 Mo. 668, 25 S.W. 211, 213; State Railroad Tax Cases, 92 U.S. 575, 606, 23 L.Ed. 663; Hannibal & St. Joseph R. Co. v. State Board of Equalization, 64 Mo. 294, 306; Elliott on Railroads, 3d Ed., Vol. 2, Sec. 883; and in respect to rolling stock in particular, see St. Louis Southwestern Ry. Co. v. State Tax Commission, Mo., 319 S.W.2d 559, 561 [1]. In assessments there is no such thing as an absolute "true value," "true cash value," or "actual cash value," because an assessment is at best an estimate and it is presumed correct unless proved by the taxpayer to be arbitrary or discriminatory. Cupples-Hesse Corp. v. State Tax Commission, supra, 329 S.W.2d l. c. 700 [3]. Actual cash

value "is the amount of cash that goods will bring on the market," Bouvier Law Dictionary, p. 1209, and rarely, if ever, is a railroad assessed under circumstances where such a cash price can be shown. Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 370, 60 S.Ct. 968, 84 L.Ed. 1254.

In addition to the contentions in Points I and II relating to fair hearing and due process, appellant contends, Points V and VI, that the assessment is invalid because of refusal to consider evidence on the railroad's theory of valuation and actual cash value.

■ It already has been shown that the Commission did receive and consider such evidence. Yet this contention, despite the record and, more particularly, in the face of the previously quoted representation of Mr. Street as counsel for C. B. & Q., suggests that the railroad's theory of assessment should have been used to the exclusion of the Commission's theory.

Appellant characterizes its theory as a "unit rule" which determines "actual cash value" of a railroad "by consideration of the economic measures of value which are customarily employed in the market place, to-wit: (1) the net earnings of the railroad as a whole capitalized at some realistic rate determined in the light of then existing market conditions and (2) the market value of the outstanding shares of capital stock of the railroad plus the value of its debt— * * *. Sometimes consideration is also given by the tax appraisers in arriving at the value of the railroad to some form of cost, which must be tempered, however, by reasonable allowances for depreciation and economic obsolescence * * *."

■ Capitalization of earnings, stock, and debt, depreciated investment, and an average of these three items (as in C. B.

---

2. In order to certify its action to the railroad in compliance with Section 151.090, supra, the Commission necessarily must determine the value per mile of tracks, the value of rolling stock, and the value of roadbed, etc., of the railroad.

& Q. Exhibit T) have been recognized as criteria for determining the value of railway property. See State Railroad Tax Cases, supra, 92 U.S. 1. c. 604–606; Adams Express Co. v. Ohio, 166 U.S. 185, 222, 17 S.Ct. 604, 41 L.Ed. 965; Chicago & N. W. Ry. Co. v. Eveland, 8 Cir., 13 F.2d 442, 443 [1, 2]; Bailey v. Megan, 8 Cir., 102 F.2d 651, 655 [7]; City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833; C. B. & Q. R. R. Co. v. Dept. of Revenue, 17 Ill.2d 376, 161 N.E.2d 838; Chicago St. & P., M. & O. Ry. Co. v. State Board of Equalization and Assessment, 133 Neb. 640, 276 N.W. 391. However, in determining an assessment the Commission is not bound by any single formula, rule or method, but is free to consider all pertinent facts and estimates and to give them such weight as reasonably they may be deemed entitled, Great Northern Ry. v. Weeks, 297 U.S. 135, 139, 56 S.Ct. 426, 80 L.Ed. 532; and an assessment even if reflective of overvaluation will not be set aside unless shown by the taxpayer to be the product of "an intentional plan or design of discrimination" or "so grossly excessive 'as to be entirely inconsistent with an honest exercise of judgment.'" Cupples-Hesse Corp. v. State Tax Commission, supra, 329 S.W.2d 1. c. 700 [6], which brings this case to a consideration of appellant's Point VIII, that this assessment does discriminate against C. B. & Q.

■ An assessment whereby the property of one taxpayer is knowingly valued at a higher percentage of its value in money than the percentage of value at which another's property is assessed cannot be allowed to stand because such would constitute unconstitutional discrimination. See Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340; People ex rel. Toman v. Chicago Union Station Co., 383 Ill. 153, 163, 48 N.E.2d 524; Boonville Nat. Bank v. Schlotzhauer, 317 Mo. 1298, 298 S.W. 732, 737, 55 A.L.R. 489; Jefferson City Bridge & Transit Co. v. Blaser, 318 Mo. 373, 300 S.W. 778, 785; Columbia Terminals Co. v.

Koeln, 319 Mo. 445, 3 S.W.2d 1021; Brinkerhoff-Faris Trust & Savings Co. v. Hill, 323 Mo. 180, 19 S.W.2d 746; Koplar v. State Tax Commission, Mo., 321 S.W.2d 686.

Appellant's argument is that the Commission's assessment is greater than the 30% level of value intended for assessment of all properties in Missouri for 1966, amounting to at least 51% of the actual cash value of the railroad's distributable property in Missouri, and is thus approximately 70% excessive with relation to other property. This theory presupposes that the railroad's theory of assessment is the exclusive method and that the Commission is bound by its assumptions and values, and by the result, $20,722,000, which it obtains.

■ The record demonstrates an absence of an intentional plan of discrimination and that the assessment is reasonable and uniform.

In addition to those matters previously stated, there was evidence before the Commission on recent costs of construction of main track which would support track values well above those set for C. B. & Q. by the Commission. A Commission exhibit showed that the value per mile placed on main line, second main line, branch line, and sidetracks of C. B. & Q., compared to 27 other railroads assessed by the Commission, was neither the highest nor the lowest and that the figures were near the average of all railroads and near the values placed on tracks of similar roads. A similar exhibit compared each railroad's valuation of right of way per acre and again the same figure was used for each road except for unique situations such as that of C. B. & Q. in connection with its North Kansas City and St. Louis yards. Other railroads were shown to have similar unique situations, such as Union Pacific in its Kansas City yards, and the various Terminal Railroad yards. An exhibit containing average value of distributable property per mile for each railroad showed

an average for all roads of $31,238 compared to $26,035 for C. B. & Q. Mr. Norfleet also valued C. B. & Q. by its Three Factor Formula using figures taken from C. B. & Q. exhibits and arrived at a valuation of $36,612,877. By another exhibit, Mr. Norfleet demonstrated that under the Commission's assessment, C. B. & Q. would pay 14.41% of its taxes on distributable property in Missouri where 15.02% of the C. B. & Q. system is located. By comparison, C. B. & Q. would pay 29.69% of its taxes in Illinois where but 19.15% of the system is located. Similarly, in Iowa C. B. & Q. would pay 13.99% of its taxes on 11.70% of its system. Another exhibit showed average taxes per mile in the fourteen states in which C. B. & Q. operates. Missouri taxes per mile paid by C. B. & Q. of $1,057 compared to the average of $1,050, and the highs of Illinois, $1,780, and Wisconsin, $1,938. The average was brought down by Kansas which has no C. B. & Q. main line.

Appellant had no evidence to show any of the Commission's values to be inaccurate, excessive or discriminatory, or to refute Mr. Norfleet's opinion that the values used represented a 30% level of valuation as the Commission would hope to achieve on all property. The same methods were applied to all problems of distributable property. Appellant complains of the formula whereby rolling stock is never reduced to 100 percent; however, it is elementary that a railroad car after 15 years, if still in service, is of some value as part of a system.

These are not the circumstances indicative of an intentional plan of discrimination but, to the contrary, are those of a reasonable and uniform assessment.

The judgment is affirmed, and the stay order previously entered by this court in connection with that part of appellant's 1966 assessment in excess of $20,722,000 is dissolved.

HOUSER, and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.